7RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0290P (6th Cir.)
File Name: 01a0290p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CLEVELAND BRANCH,
NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF
COLORED PEOPLE, and
NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF
COLORED PEOPLE,
      *Plaintiffs-Appellants,*

      *v.*

CITY OF PARMA, OHIO,
      *Defendant-Appellee.*

No. 99-3546

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 90-01404—Kathleen McDonald O'Malley, District
Judge.

Argued: January 23, 2001

Decided and Filed: August 28, 2001

1

Before:  BOGGS and MOORE, Circuit Judges; COHN, Senior District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  David L. Rose, ROSE & ROSE, Washington, D.C., for Appellants.   Joseph J. Morford, ARTER & HADDEN, Cleveland, Ohio, for Appellee.  **ON BRIEF:** David L. Rose, ROSE & ROSE, Washington, D.C., for Appellants.   Joseph J. Morford, ARTER & HADDEN, Cleveland, Ohio, for Appellee.

   MOORE, J., delivered the opinion of the court, in which COHN, D. J., joined.  BOGGS, J. (pp. 40-49), delivered a separate dissenting opinion.

_____

**OPINION**

_____

   KAREN NELSON MOORE, Circuit Judge.  On August 6, 1990, Plaintiffs-Appellants, the Cleveland Branch of the National Association for the Advancement of Colored People ("NAACP") and the NAACP (collectively referred to as "the NAACP"), filed this action against the City of Parma, Ohio ("Parma"), alleging that Parma discriminates on the basis of race in its recruitment, selection, and hiring of municipal employees.  On March 30, 1998, nearly eight years later and after the lawsuit had been transferred twice within the United

_____

   [*]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

States District Court for the Northern District of Ohio,[1] the district court granted summary judgment in favor of Parma, holding both that the NAACP lacked standing to assert its claims and that its claims were moot. The NAACP now appeals the district court's decision. For the reasons that follow, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. PARMA'S RACIAL HISTORY

Parma is a suburb of Cleveland, Ohio, located on the southern border of Cleveland near the center of the east-west axis of Cuyahoga County. In 1980, a federal district court judge found that Parma, a predominantly white city, had discriminated against Blacks in providing low and moderate income housing and issued a remedial order requiring Parma to take affirmative steps to eliminate its discriminatory housing practices and their effects. *See United States v. City of Parma*, 494 F. Supp. 1049 (N.D. Ohio 1980), *aff'd*, 661 F.2d 562 (6th Cir. 1981), *cert. denied*, 456 U.S. 926 (1983); *see also United States v. City of Parma*, 504 F. Supp. 913 (N.D. Ohio 1980) (remedial order), *aff'd in part and rev'd in part*, 661 F.2d 562 (6th Cir. 1981), *cert. denied*, 456 U.S. 926 (1983). Despite efforts by the city to diversify, however, the minority population of Parma has grown only slightly. Specifically, Parma's black population has remained very

---

[1]This case was originally assigned to the late Judge Frank Battisti. After his death, the case was transferred in November of 1994 to Judge Robert Krupansky, who was then sitting as a district judge by designation. On April 18, 1996, Judge Kathleen O'Malley, the judge to whom this case had been transferred the previous month, entered an order to which the parties agreed. This order denied without prejudice as moot all pending motions, some of which had been pending for more than four years, and requested that the parties settle or renew any previous motions. In 1997, Parma and the NAACP filed renewed motions for summary judgment.

small.    For example, in 1970, Blacks comprised approximately .05%, or 50 persons, out of Parma's 100,216 resident population, *see Parma*, 494 F. Supp. at 1056, and twenty years later, in 1990, Blacks still comprised less one percent of Parma's resident population, namely only .73%, or 639 persons, out of Parma's 87,876 resident population. U.S. CENSUS BUREAU, 1990 CENSUS OF POPULATION AND HOUSING (1990).[2]

Like the resident population of Parma, data suggest that the racial composition of Parma's municipal workforce also lacks diversity.  For example, despite the enactment in 1981 of a formal affirmative action program,[3] by 1988, Parma had only

---

[2]In 1990, Parma was 98% white, with 86,028 Whites, 957 Asians or Pacific Islanders, 639 Blacks, 85 American Indians, Eskimos, or Aleuts, and 167 persons belonging to other races, in its resident population.  Excluding Blacks, the non-white population of Parma equaled approximately 1.3% of Parma's resident population.  1990 CENSUS, GENERAL POPULATION AND HOUSING CHARACTERISTICS: 1990. According to the 2000 Census, 95.7% of Parma's resident population is white.  The remainder of the population in Parma is as follows, Black or African-American, 1.1%; American Indian and Alaska Native, 0.1%; Asian, 1.6%; other races, 0.4%, and two or more races, 1.1%.  U.S. CENSUS BUREAU, CENSUS 2000 REDISTRICTING DATA (2000).  A separate calculation reflects that 1.5% of the year 2000 population is Hispanic or Latino. *Id.*

[3]Parma's 1981 Affirmative Action Policy provides:
    "Affirmative Action" shall connote the City of Parma's positive and unequivocal commitment to such measures that it deems necessary to eradicate any or all vestigium of discriminatory employment practices that may have inhibited and contravened all minorities, women, the aged, and disabled from full and equal participation. . . .
    *It does require that vigorous action be taken to find ways to locate and attract qualified minorities, women, the aged and disabled and to include minorities, women, the aged and disabled in training programs so that their movement will be accelerated into those occupations and levles[sic] in which they*

---

I realize that this case has been litigated for over ten years. I also realize that the NAACP believes that, even with the changes made by the City of Parma to its municipal recruitment and hiring practices over these past ten years, the system is still discriminatory.  However, neither the delay in this litigation nor the serious claims that the NAACP is bringing justify a departure from the fundamental requirement that a plaintiff must have a continuing interest in the ongoing litigation in order for this court to exercise the limited jurisdiction it is granted by the Constitution.  *See Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases and controversies.").  This case is moot because Tomblin – and, therefore, the NAACP – no longer have a continuing interest in this litigation.  I therefore respectfully dissent.

*v. Johnson*, 771 F.2d 1335, 1339 (9th Cir. 1985) ("That other persons may litigate a similar claim does not save a case from mootness."). None of the plaintiffs that the NAACP relied upon to achieve standing in this case continue to have a "personal stake" in the outcome of this litigation. *Warth*, 422 U.S. at 498.[4] The single plaintiff that the court relies upon in order to hold that the NAACP has standing, Tomblin, no longer has a personal stake in two ways: (1) he is no longer a member of the NAACP, and (2) he no longer alleges an injury that can be redressed by a favorable judicial decision.

---

NAACP members would have standing if they had brought suit, but finding that standing deficiencies had been cured by new complaint brought by NAACP).

[4]It should also be noted that the NAACP did not seek to certify a class pursuant to FED. R. CIV. P. 23. If it had done so, and if Tomblin had been the class representative, it is likely that the NAACP's case could proceed even though Tomblin's claim had become moot. *See Sosna v. Iowa*, 419 U.S. 393, 397-403 (1975). The Court in *Sosna* recognized that when the district court certified the class, "the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by [the class representative]." *Id.* at 399. The Court held that:

> There must not only be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23, but there must be a live controversy at the time this Court reviews the case. . . . The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot.

*Id.* at 402. Since the NAACP did not seek to obtain class certification, the fact that a controversy may continue to exist between unnamed members of the NAACP and Parma does not save this case from becoming moot once the claims of the NAACP's named plaintiffs have become moot, as I believe they have.

---

one black employee out of more than 460 full-time employees, a number equivalent to approximately .22% of the city's full-time workforce. Joint Appendix ("J.A.") at 780 (1991 Expert Report of Herbert Hammerman), 811 (1990 Ries Dep.). Six years later, in 1996, Parma employed only two black full-time employees out of 464 full-time employees and no black part-time employees out of 314 part-time employees, a number which represents approximately .26% of the city's entire municipal workforce.[4] J.A. at 936-936A. Apart from these two black full-time employees, only one other employee of Parma was non-white in 1996; that employee was listed as an Asian or Pacific Islander. J.A. at 936, 936A, 1310.

Parma's statistics regarding the employment of Blacks in municipal jobs stand in stark contrast to those regarding the employment of Blacks in the private sector of Parma and in the private and public sectors of the Cleveland metropolitan area.[5] According to an Equal Employment Opportunity ("EEO") report in 1994, Blacks constituted a significantly higher portion of the private workforce in Parma than in its municipal workforce, making up 9.5% or 2,224 of the 23,476 workers in private employment in Parma. J.A. at 956 (1997 Expert Report of Herbert Hammerman). Similarly, a 1995 report of the racial composition of the private workforce in the Cleveland metropolitan area showed that Blacks comprised 15.2% of the workers in that area's private sector.

---

> *are significantly underrepresented.*

Joint Appendix ("J.A.") at 942, 944 (emphasis added).

[4]For that fiscal year, Parma hired 32 new municipal employees, none of whom were black. J.A. at 936A.

[5]The Cleveland metropolitan area generally consists of Cuyahoga, Geauga, Lake, and Medina counties. This area "is considered by the federal government to be a realistic commuting area for geographic entities within which it is located." J.A. at 956 (1997 Expert Report of Herbert Hammerman).

J.A. at 956 (1997 Expert Report of Herbert Hammerman). More importantly, state and local government employers in the Cleveland metropolitan area employed a workforce that was 31.5% black, nearly double that of the metropolitan area's private sector, more than triple that of Parma's private sector, and more than thirty-two times that of Parma's public sector. *See* J.A. at 957 (1997 Expert Report of Herbert Hammerman). In the opinion of the NAACP's expert, Herbert Hammerman, a labor market economist, this vast difference between the percentage of employees in the public and private sectors of Parma was unusual because "the employment of blacks by the state and local government public sector is [generally] substantially higher than private employment." J.A. at 956 (1997 Expert Report of Herbert Hammerman). According to Hammerman, "[t]he ratio of the percentage of blacks in public sector jobs [in 1994] to the percentage of blacks in private establishment jobs [was] 1.42," and "[a]pplying [that] national ratio, black employment available to Parma would be 13.5%." J.A. at 956 (1997 Expert Report of Herbert Hammerman). *See also NAACP v. Town of East Haven*, 892 F. Supp. 46, 50 (D. Conn. 1995) (noting that "Blacks generally have a higher representation in government than private industry").

Hammerman also explained that Parma's percentage of black municipal workers not only appeared low when compared to the percentage of black workers in the city's private sector or the public and private sectors of the Cleveland metropolitan area but also when viewed in light of the black workforce available to municipal employers in Parma, which Hammerman estimated to be about 19.7% of the available workforce. Using this estimate in an analysis of the racial composition of Parma's new municipal hires in 1996, Hammerman calculated between 2.9 and 7.5 standard deviations when he analyzed the statistical probability that random selection was responsible for the absence of Blacks from the group of new employees hired in fiscal year 1996, figures which indicated "very little probability that the failure

Tomblin admits that there was nothing else Parma could do to redress the injury he claimed to have suffered when he brought suit against Parma. Moreover, Tomblin seeks only future injunctive relief, not damages for past injuries he has suffered. Since there is no future injunctive relief that this court can give to Tomblin to redress his injuries, his claim has become moot. According to this court, "[t]he test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties . . . ." *McPherson*, 119 F.3d at 458 (internal quotations omitted). Any future injunctive relief that this court could grant Tomblin would not make a difference to him since he has stated that Parma has done all it could for him.[2] *See Spencer*, 523 U.S. at 18 ("mootness, however it may have come about, simply deprives us of our power to act; there is nothing for us to remedy, even if we were disposed to do so").

The fact that the NAACP in general may still believe that Parma's recruitment and hiring practices are discriminatory does not prevent this case from becoming moot.[3] *See Sample*

---

[2]This case differs from *McPherson*, in which this court held that the fact the plaintiff had graduated from high school did not make a case challenging the Michigan High School Athletic Association's eight-semester eligibility rule moot. 119 F.3d at 459. The court ruled that the controversy remained alive because the district court had granted a preliminary injunction allowing McPherson to play high school basketball despite his ineligibility under the rule. The court ruled that if the association was able to have the injunction reversed on appeal, the legal interests of both McPherson and the association would be affected since McPherson's high school would have to forfeit any victories in games in which McPherson played and the association could vacate or strike the records of McPherson and his high school basketball team. *Id.* at 458-59. In this case, however, Tomblin's legal interests would not be affected by any action of this court since there is no more relief that Tomblin continues to seek.

[3]This is not to say that the NAACP would be prevented from bringing another complaint against Parma. *Cf. NAACP v. Town of Harrison*, 749 F. Supp. 1327 (D.N.J. 1990) (noting that NAACP's initial complaint was dismissed because the NAACP had not demonstrated that

longer representing interests of any specific members, its claims have become moot. *Cf. Hope, Inc. v. County of DuPage*, 738 F.2d 797, 814 (7th Cir. 1984) ("The Supreme Court has *not* seen fit to extend representational capacity standing to entities other than associations which actually represent interests of parties whose affiliation with the representational litigant is that of membership . . . or substantial equivalent of membership.").

Not only is Tomblin no longer a member of the NAACP, but he no longer alleges an injury that can be redressed by a favorable judicial decision. *See Spencer*, 523 U.S. at 7. It is true that Tomblin maintains an interest in working for Parma, but his deposition testimony indicates that since the commencement of this litigation, any injury that he might have sufficiently alleged for standing purposes no longer exists. Tomblin admits that after his May 4, 1993 letter to Parma complaining that he was not notified of municipal police and fire examinations, he did receive a postcard informing him of the exam. In addition, Tomblin stated that after he received the postcard, "I just did not sit for the exam." Finally, Tomblin stated that "there was nothing else Parma could do" "[o]ther than the fact of informing me of the examination, lifting the residency requirement, having a validated test, putting a notification in the *Plain Dealer* or *Call & Post* saying that or [declaring] that the City of Parma does not discriminate against minorities, especially blacks, in the safety forces or civil service positions and hiring me . . . [i]f I scored high enough with a validated test." All of the actions that Tomblin stated that Parma could do, Parma had done, either by the time Tomblin received the postcard notifying him of the next municipal police and fire examination or soon after. The only action Parma did not do – hiring Tomblin – is not because of any discrimination on Parma's part, but because Tomblin did not sit for the examination.

traceable to her race. *See* Maj. Op. at n.19.

---

to hire any blacks was due to chance."[6]  J.A. at 967 (1997 Expert Report of Herbert Hammerman).

## B.  PARMA'S HIRING REQUIREMENTS

Before 1988, Parma limited eligibility for municipal employment to "bona fide" residents of Parma, and employees of Parma were required to remain residents during their employment with Parma. J.A. at 308 (Ordinance 223-76). In 1988, however, Parma modified its residency requirement to permit a non-resident applicant to compete for a municipal position so long as that applicant established "permanent" residence in the city within eighteen months after starting employment. Those who were employees on the effective date were required to remain residents of Parma until the fifth anniversary of the commencement of their employment; thereafter, employees could reside in any municipality bordering Parma. J.A. at 192, 309, 311 (Ordinance 86-88).

In 1995, Parma once again amended its residency ordinance to allow non-resident applicants to obtain municipal jobs so long as they moved within fifteen miles of the outer boundary of Parma within eighteen months of becoming a municipal employee. J.A. at 311 (Ordinance 299-95). This fifteen-mile boundary incorporated virtually all of Cuyahoga County, which had a black population of 24.8%, or 350,185, of the county's 1,412,140 residents in 1990.[7] U.S. CENSUS BUREAU,

---

[6]Using the more conservative estimate of 9.5%, which equals the percentage of black workers in Parma's private workforce, Hammerman calculated a disparity of 6.7 standard deviations between the expected and actual number of black employees in Parma's municipal workforce. J.A. at 957 (1997 Expert Report of Herbert Hammerman) (stating that this "indicates no meaningful probability that the event has occurred by chance").

[7]The 2000 Census shows that the percentage of Blacks in Cuyahoga County had not changed since 1990, with Blacks comprising 24.7%, or 382,634 individuals, out of the county's 1,393,978 resident

1990 CENSUS OF POPULATION AND HOUSING (1990). On June 3, 1996, Parma extended the boundary to twenty-two miles. J.A. at 313 (Ordinance 191-96).

Despite the changes that have been made to Parma's municipal job requirements, the record shows that Parma still continues to ask job applicants for information regarding their residency beyond their mailing address on its employment application. Specifically, Parma asks applicants to specify how many years and months they have lived in Parma if they are residents, whether they have relatives employed by the city, and what is the residence of any person recommending them for employment with Parma. J.A. at 1183 (Employment Application). Also, in September 1989, more than a year after repealing its official residency requirement, Parma hired three individuals, Greg Kohler, Vincent Semanik, and Robert Tarro, from an eligibility list that was created before Parma repealed its residency requirement, *see* Supplemental ("Supp.") J.A. at 58; J.A. at 978, 982, 984, and a few months thereafter, in April 1990, Parma hired three more individuals, Joseph Bobak, Daniel Heinz, and Orville Hildebrand, from an eligibility list that was created before Parma repealed its residency requirement, *see* Supp. J.A. at 58; J.A. at 974, 977.

Additionally, based on the data presented to the district court, the vast majority of recent hires for Parma have been residents of the city. For example, of the twenty-eight applicants who secured employment with Parma in early 1997, twenty-five were residents of Parma, and eight of the twenty-eight had close relatives who were Parma employees. J.A. at 1380-1473. Furthermore, Parma has hired a substantial number of its full-time municipal employees from its pool of provisional, part-time, or temporary employees, many of whom were recommended by current employees of Parma. J.A. at 1188-1216, 1230-31. For example, out of

population. U.S. CENSUS BUREAU, CENSUS 2000 REDISTRICTING DATA (2000).

## II

The court concludes that the NAACP has standing to sue on behalf of *only one* of its seven plaintiffs, Tomblin, because he satisfied all the necessary requirements for standing at the time this litigation commenced. The court fails to engage in a mootness inquiry, however. There are two ways in which Tomblin lost a personal interest in this litigation, causing his claim, and, therefore, the NAACP's claim, to be rendered moot.

The NAACP has asserted that it has associational standing to sue Parma. The court concludes that the NAACP had associational standing when it brought suit against Parma because Tomblin was a member of the NAACP at that time. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) ("an association has standing to bring suit on behalf of its members when . . . its members would otherwise have standing to sue in their own right"). Tomblin is no longer a member of the NAACP. Tomblin testified in his 1997 deposition that he was no longer a member of the NAACP and that he had ceased being a member in the past few years prior to 1997. He stated that he stopped being a member of the NAACP because, "I probably just shifted my intentions to other things." In order for this case to be justiciable, "[t]he association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of a challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added). The NAACP is unable to demonstrate that any one of its members continues to have a personal interest in this litigation.[1] Since the NAACP is no

[1] The only plaintiff who was a member of the NAACP at the time the NAACP filed its complaint and who has continued to be a member of the NAACP throughout this litigation is Rhonda Crayton, who the court concedes cannot be relied upon by the NAACP to obtain standing since she cannot demonstrate that Parma's decision not to hire her was fairly

after they lost their status as presiding officers of state legislature); *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (holding that plaintiff no longer had a continuing interest in declaratory judgment action challenging statute making it a crime to distribute anonymous literature in an election campaign, since plaintiff's claim related to a particular congressman who had left office after the commencement of litigation). Recent Supreme Court cases, namely *Friends of the Earth* and *Arizonans for Official English*, continue to espouse the principle that a plaintiff must have a continuing interest in ongoing litigation.

The *City Communications* court's use of standing language to engage in a mootness inquiry is understandable. "Mootness principles may indeed blend quite directly with standing . . . . The blend may be reflected simply in the phrases of decisions." WRIGHT ET AL., *supra*, § 3533.1, at 219. Certain principles of standing, then, may affect a mootness inquiry. This was demonstrated in a recent Supreme Court case in which the Court assessed whether a habeas corpus petitioner's "subsequent release caused the petition to be moot because it no longer presented a case or controversy under Article III." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). The Court stated that "[t]he parties must continue to have a 'personal stake in the outcome' of the lawsuit." *Ibid.* (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78 (1990)). The Court made clear that, "[t]his means that, *throughout the litigation*, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Ibid.* (quoting *Lewis*, 494 U.S. at 477) (emphasis added). In *Spencer*, the Supreme Court directly used elements of the standing inquiry to determine that the petitioner no longer had an injury in fact and that, therefore, his claim had became moot.

thirteen full-time positions posted for new hires between November 20, 1995, and March 8, 1996, at least six were filled by former part-time employees, and two others were filled by transfer or promotion without any indication of a change from part-time to full-time. J.A. at 1165 (noting that Cheri Meadows was a part-time employee before she was transferred to a full-time position), 1188-1217.[8]

According to Parma, however, it has made efforts to recruit Blacks to its municipal workforce. Specifically, Parma claims that it has attempted to recruit Blacks by developing, distributing, and displaying posters and brochures directed at minorities at all three campuses of Cuyahoga Community College, Cleveland State University, Lorain Community College, and Lakeland Community College, *see* J.A. at 337, 409; Supp. J.A. at 144, 183; listing scheduled civil service examinations in the Cleveland *Plain Dealer*, the *Communicator* and the *Call & Post*, newspapers targeted to Cleveland's black community, and the *Sun* newspapers, *see* J.A. at 340-47, 358-60, 1069-78, 1302-09; Supp. J.A. at 142-43, 153-55 (1991 Ponstingle Dep.); and working with a consulting company to create a new test for hiring police officers and firefighters, *see* J.A. at 416.

## C. NAACP'S ALLEGATIONS

The NAACP argues that the low percentage of Blacks in Parma's municipal workforce is not the result of chance, but of discriminatory practices used by Parma in its hiring process. Specifically, the NAACP maintains that Parma discriminates against Blacks in hiring:

  a.  By failing or refusing to recruit and hire blacks on the same basis as whites;

---

[8] A union contract required Parma to consider applications from employees within the bargaining unit before considering any other applications. J.A. at 1160-60A.

b.  By following recruitment practices which advise residents of Parma, and friends and relatives of incumbent employees of Parma, of employment opportunities in the municipal employment of Parma without advising black persons in the relevant labor market of such opportunities;

c.  By following recruitment practices which have the effect of deterring non-residents, including almost all blacks, from applying for employment opportunities with Parma;

d.  By traditionally requiring that appointments be limited to residents of Parma, and by requiring that employees of defendant establish and maintain their residence in Parma for forty-two months, a requirement that was intended to exclude and does disproportionately exclude blacks from municipal employment;

e.  By failing and refusing to take the appropriate recruitment measures to correct the effects of the defendant's past discriminatory policies and practices;

f.  By limiting hiring, until very recently, to lists of eligible[sic] created when appointments were limited to residents of Parma;

g.  By using unvalidated selection procedures that have the effect of disproportionately excluding from employment those black applicants who do obtain timely information regarding employment opportunities and who are not deterred by the discriminatory practices of defendant.

contravenes that of *City Communications*, appears to overrule *City Communications*.

In *City Communications*, 888 F.2d at 1086 n.3, the court noted that its holding "might appear to be at odds" with this court's previous holding in *Senter v. General Motors Corporation*, 532 F.2d 511, 520 (6th Cir. 1976), in which this court stated that "[s]tanding is determined as of the date the suit is filed." The court in this case chooses to apply *Senter* while ignoring *City Communications*. I believe that both cases bind us and both need to be applied to the facts of this case. I believe that the court does not err in applying *Senter*, but I believe that it does err in not applying the legal principles underlying *City Communications*.

The court in *City Communications* uses the language of standing to apply a mootness analysis. The court's statement that a plaintiff must maintain standing throughout all stages of litigation is really a requirement that the plaintiff have a continuing interest in the litigation in order to prevent the litigation from becoming moot. In *City Communications*, the court was determining whether the plaintiff had a continuing interest in the litigation after the plaintiff had been dissolved and later renewed as a corporation. 888 F.2d at 1086.

As Parma admitted at oral argument, the Supreme Court has not specifically held that standing must be evaluated at the time it is challenged. Instead, the Court has consistently held that a plaintiff must maintain a continuing interest in ongoing litigation. Indeed, the Supreme Court cases cited in *City Communications* for the *proposition* that standing must be evaluated at the time it is challenged do not apply that rule, but rather evaluate whether a party had a continuing interest in ongoing litigation. *See Karcher v. May*, 484 U.S. 72, 77-78 (1987) (holding that former speaker of New Jersey General Assembly and president of New Jersey Senate who intervened and participated in lawsuit challenging constitutionality of New Jersey statute providing for one minute of silence at beginning of school day lost continuing interest in litigation

*course of litigation, to the moment of final appellate disposition.* The need for continuing vitality is attributed both to Article III and to more openly discretionary doctrines of remedial utility and judicial administration.

13A Charles Alan Wright et al., Federal Practice and Procedure § 3533, at 211 (2d ed. 1984) (emphasis added). This court has noted that, "[t]he mootness inquiry must be made *at every stage of a case*; thus, if a case becomes moot during an appeal, the judgment below must be vacated and the case remanded with instructions to dismiss." *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (emphasis added). Furthermore, "[i]n analyzing issues of mootness it is helpful to keep in mind that '[t]hese problems often require a highly individualistic, and usually intuitive, appraisal of the facts of each case.'" *McPherson*, 119 F.3d at 465 (Moore, J., dissenting) (quoting Wright et al., *supra*, § 3533, at 211-12).

The court recognizes the requirement that a plaintiff must continue to have a personal interest in ongoing litigation by citing language to that effect from *Friends of the Earth* and *Arizonans for Official English*. However, the court fails to apply this language and undertake this required analysis, seemingly concluding that once the NAACP met the requirements for associational standing through Tomblin, the NAACP's task in avoiding mootness was over.

The court discusses in great detail the principle that standing must be determined at the time a complaint is filed. I agree that the initial determination of a party's standing to bring a lawsuit must be made at that point. I note, however, that the court's broad statement, "standing does not have to be maintained throughout all stages of litigation," Maj. Op. at p. 17, appears to overrule previous binding authority of this court. This court has previously held that "[a] plaintiff must maintain standing throughout all stages of his litigation." *City Communications, Inc. v. City of Detroit*, 888 F.2d 1081, 1086 (6th Cir. 1989). The court's language, which directly

J.A. at 230-31 (Second Amended Complaint).[9]

In making these allegations, the NAACP cited to seven different alleged victims of Parma's discriminatory practices. These individuals include: (1) Marlon Allen, who was interested in employment as a Parma firefighter but "did not hear of any opportunities to apply for the examination"; (2) Rodney Blanton, who applied for a police officer position with Parma but was "disqualified for 'background' reasons"; (3) Wendy Childress, who was interested in working for Parma as a firefighter but never saw any advertisements for municipal jobs in Parma and "would not take a job that required her to live in Parma"; (4) Rhonda Crayton, who wanted to obtain a job as a Parma police officer but failed the agility portion of the required police examination; (5) Maurice McIntosh, who visited Parma City Hall in February of 1990 and attempted to apply for a position with the city but "was informed that the City already had enough minorities, and was told that he would be notified if any openings in the positions he had identified came up"; (6) Artis Tomblin, who inquired about employment opportunities with Parma but was never contacted; and (7) Arthur Collins, who inquired about jobs for Parma in 1990 but "would not accept a job with Parma if he

---

[9] On September 27, 1991, Parma moved to dismiss the NAACP's claims, arguing that the NAACP lacked standing to sue and that the NAACP's claims were time-barred. On December 12, 1991, the district court entered an order requiring the NAACP to submit "'further particularized allegations of fact'" to support its standing. J.A. at 206 (citation omitted). In response, the NAACP filed an amendment to the complaint and then moved for a second amendment. This motion for leave to file a second amended complaint was among those denied as moot but without prejudice to its refiling in the district court's 1996 order. *See supra* n.1. Even though the NAACP later filed a renewed motion for summary judgment, it never renewed the earlier motion for leave to file a second amended complaint. However, because the parties' briefs and the district court's order address only the NAACP's second amended complaint, our review of this case is governed by the claims in the second amended complaint. *See, e.g., Gillis v. United States Dep't of Health and Human Servs.*, 759 F.2d 565, 570-71 (6th Cir. 1985).

had to move there." J.A. at 232-34 (Second Amended Complaint).[10]

## D. DISTRICT COURT'S ANALYSIS

### 1. Scope of EEOC Charge

In its decision on the NAACP's claims, the district court first identified the claims it deemed to be properly before the court. These claims included: (1) "the NAACP's claims regarding Parma's residency requirement in both its 1976 (to the extent and only to the extent eligibility lists continued to be constructed from applicants who sought employment prior to the 1988 change) and 1988 incarnations;" and (2) "the NAACP's claims regarding Parma's reliance on word-of-mouth and City Hall postings to recruit applicants for jobs." J.A. at 52.

The district court then held that the NAACP's challenge to Parma's police, firefighter, and other examinations were "not properly before [the] Court" because such "claim was neither expressly made in the EEOC charge, nor could it fairly be said to have 'grown out of' that charge." J.A. at 52. The district court reasoned that "[t]he EEOC charge read as a whole clearly focus[ed] on the residency requirement and other recruitment practices," and as a result, the charge "did not put the EEOC or Parma on notice that such a practice was being challenged, and did not allow a meaningful opportunity for the accomplishment of Title VII's mediation goals." J.A. at 52. The district court further reasoned that the EEOC charge was not entitled to any leniency because it was drafted by a representative of the NAACP and because later filings by the NAACP, including its complaint and amendments, failed

---

[10] The NAACP requested injunctive relief, enjoining Parma from continuing the alleged discriminatory practices, costs, attorneys' fees, expert witness fees, and "such additional relief as may be appropriate in the interests of justice." J.A. at 235-37 (Second Amended Complaint).

employment "mooted the case stated in her complaint" when she resigned from state employment to pursue work in the private sector. *Id.* at 72. The Court noted that the plaintiff's claim sought only injunctive relief and rejected the plaintiff's attempt to revive the case through an implied plea for nominal damages. *Id.* at 68-71.

The distinction between standing and mootness was again discussed in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191-92 (2000). There, the Supreme Court stated:

> Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal. *This argument from sunk costs does not license courts to retain jurisdiction over cases in which one or both of the parties lacks a continuing interest . . . .* But the argument surely highlights an important difference between the two doctrines.

*Ibid.* (emphasis added). The Court's discussion indicates that although a party may have standing at the time a complaint is filed, and even though a case, such as this one, may continue on for years, a party may lose a continuing interest in the litigation, and therefore cause its claim to become moot.

The requirement that a party must have a personal interest in ongoing litigation in order to avoid mootness is well-recognized within the law:

> Mootness doctrine encompasses the circumstances that destroy the justiciability of a suit previously suitable for determination. It is not enough that the initial requirements of standing and ripeness have been satisfied; *the suit must remain alive throughout the*

---------------

**DISSENT**

---------------

BOGGS, Circuit Judge, dissenting. I would affirm the district court's decision granting summary judgment to the City of Parma.

I agree with the court that the NAACP had standing to sue Parma at the time the NAACP brought suit. I also agree with the court that the NAACP's claims have not become moot *solely* because of actions that Parma has taken subsequent to the institution of this lawsuit. I believe, however, that the NAACP's claims have become moot because the *sole* NAACP member that the court relies upon to grant the NAACP standing, Artis Tomblin, has lost a personal interest in this litigation. Tomblin is no longer a member of the NAACP and he no longer has an injury that this court can redress. Since Tomblin no longer has a personal interest in this litigation, his claim, and, therefore, the NAACP's claim, have become moot. Because the court fails to analyze whether Tomblin continues to have a personal interest in this litigation, I respectfully dissent.

I

Both the district court's and our court's opinions appear to conflate standing and mootness. There is an important difference: "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)) (internal quotation omitted). In *Arizonans for Official English*, the Court ruled that a plaintiff who challenged the State of Arizona's policy declaring English the official language of the state by attempting to use her bilingual skills in state

specifically to identify a challenge to Parma's civil service examinations. J.A. at 53, 55.

**2. Mootness**

After identifying the claims in the case, the district court then held that they were moot because "Parma's elimination of the residency requirement [in 1988] and its affirmative — and active — efforts to recruit individuals, including minorities, outside of Parma, have given the NAACP what they sought to achieve by this action." J.A. at 58. The district court held that there was "no reasonable expectation that Parma [would] reenact the challenged ordinance or practices, and Parma's repeal of the residency requirement and other affirmative actions have eradicated the effects of what properly has been challenged in this case." J.A. at 58. In so holding, the district court noted that municipal employees of Parma were "free to live anywhere in Cuyahoga [C]ounty, and may even live in surrounding counties" and that Parma had taken other steps to improve its recruitment efforts by "advertis[ing] in three newspapers, one of which has a predominately black readership, regularly post[ing] job openings at several local colleges which have significant black student bodies (using brochures directed at recruiting blacks), . . . routinely mail[ing] postcards notifying anyone who requests to be informed about upcoming civil service, police officer, and fire fighter examinations," and "volunteering to use whatever police officer examination the NAACP wants and representing that it would do the same for the fire fighter examination." J.A. at 57, 59. According to the district court, "[t]he status quo [in Parma] in 1998 . . . [did] not mirror the status quo twenty years earlier [because] [i]n the intervening years since the late 1970's and early 1980's, Parma's laws and practices have changed to such a degree that the NAACP is left complaining about what was wrong in the past, rather than what is wrong today." J.A. at 62.

**3. Standing**

Finally, the district court held that, even if the case were not moot, it would still grant summary judgment in favor of Parma because the NAACP lacked standing. Specifically, the district court held that the NAACP lacked standing because "none of the individuals identified as members of the organization have standing in their own right." J.A. at 62.

In reaching this conclusion, the district court first asserted that each individual plaintiff had to show that there was a substantial likelihood that the alleged injurious practice or practices would be applied to him or her to establish an injury-in-fact, one prerequisite for standing. J.A. at 66. The district court further noted that, because the NAACP sought only prospective relief and because "the *only* injury which [the district court] possibly could remedy in this case [was] a *future* injury," an individual plaintiff would have to show that "he or she still seeks to work for Parma, and has taken some action toward that end . . . that shows a present intent" in order to establish an injury-in-fact. J.A. at 67, 68.

The district court then analyzed each individual plaintiff to determine if he or she had standing. In so doing, the district court held that (1) Collins and McIntosh lacked standing because they were not members of the NAACP at any time during the litigation, *see* J.A. at 69; (2) Crayton lacked standing because she had "not inquired about obtaining a position with the Parma Police or taken any other steps which would indicate a sincere desire or genuine interest in obtaining such a position" since 1990 and thus failed to show imminent injury and because "her claim [was] premised solely on her failure of the agility portion of the police examination," which she contends "was a product of gender discrimination" and thus failed to demonstrate causation and redressability, *see* J.A. at 70; (3) Tomblin lacked standing because he had shown only that he was "'generally interested'" in working for Parma and because the elimination of the residency requirement "serves to redress the very injury

to advertise in a manner that could effectively aid the recruitment of Blacks to its municipal workforce.

### III. CONCLUSION

In conclusion, we hold that the NAACP established associational standing through Tomblin, that the NAACP's claims are not moot, that the NAACP's claims are ripe, that the NAACP's charge was such that an investigation of Parma's testing procedures could reasonably be expected to grow out of its EEOC charge, and that the NAACP timely filed its charge. For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

Moreover, the fact that a representative of the NAACP drafted the charge in this case does not require us to conclude that a challenge to Parma's civil service examinations is not within the scope of the charge. While the representative of the NAACP may have been more familiar with "the technicalities of the law" as a result of her work, there is nothing to suggest that such representative was a lawyer or well-versed in the law. *See Ang*, 932 F.2d at 546. Furthermore, the fact that a broader reading of a charge is required where a plaintiff does not have an attorney, *see Duggins*, 195 F.3d at 832 (noting that a broader reading is compelled where a plaintiff is unrepresented by an attorney), does not mean that a broad reading may not, or should not, be given in cases where a plaintiff has counsel. In sum, we hold that the NAACP's challenge to Parma's testing procedures was within the scope of its EEOC charge and, as a result, hold that the district court erred in excluding such challenge from this case.

**E.  TIMELINESS OF EEOC CHARGE**

Parma also argues that the NAACP failed to file its EEOC charge within 300 days of the alleged unlawful employment practice, as required by 42 U.S.C. §2000e-5(e), because no EEOC charge was filed within 300 days of the enactment of Parma's 1988 ordinance repealing the residency requirement. We reject this argument.

The NAACP was not required to file an EEOC charge within 300 days of the enactment of the 1988 ordinance, as the NAACP argues, in part, that Parma is still according an unfair preference to its residents. Furthermore, as shown by the allegations in the NAACP's complaint, the NAACP is challenging more than Parma's residency requirement, including its move-in residency requirement and a variety of recruitment, selection, and hiring practices used by Parma both before and after the repeal of its residency requirement. *See* J.A. at 230-31. For example, the NAACP is challenging Parma's use of word-of-mouth hiring practices and its failure

about which Tomblin complained," *see* J.A. at 72-73; (4) Blanton lacked standing because he had no further interest in working for the Parma police department and because he had failed to show redressability because his complaint did not concern Parma's residency requirement or recruitment practices but its refusal to retain him on its eligibility list, *see* J.A. at 74-75; (5) Childress lacked standing because she "has never contacted or taken even the smallest step to determine what she would have to do to obtain employment with Parma" and "has absolutely no interest in applying for employment with Parma" and thus can establish no injury-in-fact, *see* J.A. at 75; and (6) Allen lacked standing because he lived in Atlanta and had no interest in returning to the Cleveland area, *see* J.A. at 75.

After discussing each individual plaintiff, the district court then noted that Tomblin, Childress, and Blanton did not have standing for an additional reason: they failed to maintain their membership throughout the entire litigation. According to the district court, for the NAACP to continue this lawsuit based upon standing through a particular member of the NAACP, that member had to maintain his membership until the completion of litigation to ensure that such member had some level of control over the organization throughout the litigation. J.A. at 79-80. In other words, according to the district court, standing must exist not only at the start of a case but also throughout its course.

**II.  ANALYSIS**

We review de novo a district court's grant of summary judgment. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000). Summary judgment is proper only when there is no dispute as to a material question of fact and one party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). Viewing all facts and inferences drawn therefrom in the light most favorable to the nonmovant, we then determine whether the evidence presented is such that a reasonable jury could find for that party. *See Nguyen*, 229

F.3d at 562 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## A. STANDING

The NAACP argues that the district court erred in determining that the NAACP did not have standing to pursue its claims. Whether a party has standing is a legal question reviewed de novo. *Ohio Ass'n of Indep. Schs. v. Goff*, 92 F.3d 419, 421 (6th Cir. 1996), *cert. denied*, 520 U.S. 1104 (1997). To satisfy Article III's standing requirements, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). An association may obtain "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 181 (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

After careful review, we conclude that the district court erred in determining that the NAACP did not have standing to bring the case. Instead, we hold that the NAACP had standing to sue on behalf of Tomblin, who satisfied all the necessary requirements for standing.

### 1. When Standing Is Determined

Before we discuss how the NAACP obtained associational standing through Tomblin, we must first address the question of when standing is to be determined. Our review of Supreme Court and Sixth Circuit case law informs us that, contrary to

J.A. at 1100-01. Similarly, in September 1991, Edward McCaffery, an individual who had designed one of Parma's police examinations in the early 1990s, engaged in the following colloquy during his deposition:

Q:  Turning to your letter, Captain, if you would. And making reference to the written examination with the five parts that are listed on pages 1 and 2 of Plaintiff's Exhibit Number 1. Do you have any knowledge as to whether written examinations of the kind that are described here in parts 1, 2, 3, 4 and 5, whether whites and blacks score differently or the same in tests of this kind?

*****

Q:  Sure. Have you seen any studies or literature as to whether written examinations of the general kind that you have here as a whole tend to have an adverse impact on blacks?

A:  That's quite a jump logically. Yes, I've read material that stated that written examinations did have adverse impact on various groups.

J.A. at 1259-61. Furthermore, Parma knew that one of the NAACP's individual plaintiffs was Crayton, who had failed the agility portion of the police civil service examination and was challenging certain aspects of that test as applied to Blacks. J.A. at 349-52 (1990 Dep. of Elizabeth Woolson, Sec'y of Civil Serv. Comm'n) (questioning Woolson about the procedure for scoring Crayton's examination). In fact, during the course of this litigation, the NAACP presented a October 1991 affidavit from one expert, Lance Seberhagen, regarding the disparate impact that Parma's civil service examination allegedly had on Blacks. J.A. at 930-33. In essence, in light of the NAACP's actions during discovery, Parma cannot now claim ignorance of the NAACP's interest in challenging its testing procedures.

Furthermore, contrary to the district court's assertions, we believe that Parma had notice of the NAACP's intent to challenge Parma's civil service testing procedures and that Parma was not prejudiced by statements made in pleadings filed by the NAACP during this litigation. The NAACP explicitly stated in its complaint that it was challenging Parma's use of "unvalidated selection procedures that have the effect of disproportionately excluding from employment those black applicants who do obtain timely information regarding employment opportunities and who are not deterred by the discriminatory practices of defendant." J.A. at 231. Early in the course of this litigation, the NAACP questioned several of Parma's civil service administrators and other witnesses about the validity of Parma's examinations. J.A. at 1085, 1100-06 (1991 Dep. of James Merlino, Chairman of the Parma Civil Serv. Comm'n); 1245-51, 1259-77 (1991 Dep. of Edward McCaffery). For example, in his deposition in September 1991, James Merlino, the Chairman of the Civil Service Commission was questioned as follows:

Q:   And that also from your prior testimony that the test they gave that led to the 1990 police test was the first one, the first test for entry level police officer that McCaffery did for the city of Parma?

A:   Yes.

Q:   Did Mr. or Captain McCaffery or his associate present to you anything that they described as a validity study to the best of your knowledge?

*****

A:   For the police entry level examination?

Q:   Yes.

A:   As I recall, no, they did not present one.

the district court's conclusion, standing does not have to be maintained throughout all stages of litigation. Instead, it is to be determined as of the time the complaint is filed.

The Supreme Court has consistently held that "jurisdiction is tested by the facts as they existed when the action [was] brought" and "'that after vesting, it cannot be ousted by subsequent events.'" *Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957) (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)); *see also Freeport-McMoRan Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991). In *Friends of the Earth*, the Supreme Court applied its "longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed," *Lujan*, 504 U.S. at 570 n.4, when it concluded that the plaintiffs had standing to seek both injunctive relief and civil penalties. In support of its holding, the Supreme Court repeatedly noted that the plaintiffs' injuries were occurring as of the time their complaint was filed. *See, e.g., Friends of the Earth*, 528 U.S. at 184 ("Here, in contrast, it is undisputed that [the] unlawful conduct . . . was *occurring at the time the complaint was filed*."); 185 ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct *ongoing at the time of suit . . . .*") (emphasis added); *see also Becker v. Federal Election Comm'n*, 230 F.3d 381, 386 n.3 (1st Cir. 2000) (noting that *Lujan* "clearly indicat[es] that standing is to be 'assessed under the facts existing when the complaint is filed'"); *White v. Lee*, 227 F.2d 1214, 1243 (9th Cir. 2000) ("Standing is examined at 'the commencement of the litigation.'"); *Park v. Forest Serv. of the United States*, 205 F.3d 1034, 1037 (8th Cir. 2000) ("We do not think, however, that the actual use of checkpoints in 1997, 1998, and 1999 is relevant on the issue of standing because all of these events occurred after [the plaintiff] filed her original complaint."); *Perry v. Village of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) ("Because standing goes to the jurisdiction of a federal court to hear a particular case, it must exist at the commencement of the suit."); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter

jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction."). The Supreme Court then held that the plaintiff in *Friends of the Earth* had standing to assert its claims because the plaintiff had successfully shown that its injury occurred at the time the complaint was filed. In reaching this decision, the Supreme Court distinguished *Friends of the Earth* from *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), in which it held that a plaintiff lacked standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat from that policy, stating "[h]ere [in *Friends of the Earth*], in contrast, it is undisputed that [the defendant's] unlawful conduct . . . *was occurring at the time the complaint was filed.*" *Friends of the Earth*, 528 U.S. at 184 (emphasis added).

The Supreme Court then proceeded to explain how mootness is distinct from standing, noting that the "[s]tanding doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which parties have a concrete stake" while "by the time mootness is an issue, the case has been brought and litigated, often (as here) for years." *Id.* at 191. In other words, whereas standing requires proof "that, if unchecked by litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending,'" a claim of mootness based on voluntary compliance mandates proof that "the allegedly wrongful behavior [cannot] reasonably be expected to recur." *Id.* at 190 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (alteration in original). In essence, standing concerns only whether a plaintiff has a viable claim that a defendant's unlawful conduct "was occurring at the time the complaint was filed," *id.* at 184, while mootness addresses whether that plaintiff continues to have an interest in the outcome of the litigation. *See, e.g., Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) ("As a state employee subject to Article XXVIII, Yniquez had a viable claim at the outset of

plaintiff from asserting a claim that was not within the scope of his EEOC charge. However, "[b]ecause Title VII is a remedial statute, many courts refuse to narrowly construe the charge where such a construction would preclude a plaintiff from bringing a claim." *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir. 1991). Consequently, "[c]ourts have expanded upon the charge filing requirement . . . to provide that a party's discrimination claim . . . may include claims 'limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.'" *Davis*, 157 F.3d at 463 (quoting *EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1235 (6th Cir. 1980)); *see also Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832 (6th Cir. 1999) (holding that the district court erred by not considering evidence of alleged retaliatory acts where the plaintiff "related facts to the EEOC which would have prompted an investigation into retaliation"); *Farmer v. ARA Servs., Inc.*, 660 F.2d 1096, 1105 (6th Cir. 1981) (holding that the charge of the female plaintiffs, which specified denial of fair representation by their union, would have led the EEOC to investigate the plaintiffs' equal pay claim and challenge to certain collective bargaining provisions).

We conclude that the district court erred in determining that the NAACP's challenge to Parma's police, firefighter, and other examinations did not fit within the scope of its EEOC charge. While much of the NAACP's charge focuses on Parma's residency requirements and recruiting practices, it also explicitly refers to Parma's hiring practices with "*civil service jobs*" and notes that "Parma discriminates in hiring by refusing to recruit, consider, *select* and employ blacks on the same basis as whites." J.A. at 193 (emphasis added). In light of the fact that civil service examinations are the very means by which Parma creates the eligibility lists for its civil service jobs, we believe that it was error to conclude that an investigation of such examinations would not reasonably be expected to grow out of the NAACP's charge of discrimination.

applied to them in a concrete fashion." Parma's Br. at 44. Parma's argument is completely without merit.

This case is not anchored in future events that have not occurred, but in events that have already occurred. As already noted, one NAACP member, Tomblin, did assert that Parma's residency requirements were applied to him in a concrete way. Specifically, Tomblin asserted that he was deterred from sitting for a civil service examination in Parma in 1990 because of the city's move-in residency requirement. J.A. at 649. Furthermore, as shown by the NAACP's complaint, the NAACP is challenging more than the application of Parma's past and present residency requirements, including Parma's refusal to treat black and white applicants equally, its use of word-of-mouth hiring and City Hall postings, and its minimal advertising. As evidenced by Tomblin's EEOC affidavit and deposition testimony, claims regarding these practices are ripe for adjudication, as the NAACP has created a genuine issue of material fact regarding whether Tomblin and other Blacks were harmed by Parma's allegedly discriminatory recruitment, selection, and hiring practices.

## D.  BREADTH OF THE EEOC CHARGE

Finally, the NAACP argues that the district court erred by limiting the scope of this action to a challenge to Parma's former residency requirement and alleged practice of limiting the recruitment of municipal employees to word-of-mouth through friends and relatives of Parma's municipal employees and by excluding any challenges to the testing procedures and examinations used by Parma. We agree with the NAACP.

The purpose of filing a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC. An EEOC charge notifies potential defendants of the nature of a plaintiff's claims and provides the opportunity for the parties to settle claims before the EEOC instead of litigate them. *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998). Therefore, courts preclude a

the litigation in late 1988. . . . Yniquez left her state job in April 1990 to take up employment in the private sector, where her speech was not governed by Article XXVIII. At that point, it became plain that she lacked a still vital claim for prospective relief [and that her claim was moot]."); *see also Friends of the Earth*, 528 U.S. at 192 (describing *Arizonans for Official English*).

Applying the principles of *Friends of the Earth*, we believe that it is clear that the NAACP only needed to establish standing at the time that its complaint was filed. Indeed, in *Senter v. General Motors Corp.*, 532 F.2d 511 (6th Cir.), *cert. denied*, 429 U.S. 870 (1976), this court highlighted the importance of determining standing as of the time of the complaint in Title VII cases, such as this one. In *Senter*, an employer challenged an employee's standing to bring a class action based upon alleged discrimination in the company's promotional practices, arguing that the employee had suffered no injury because he was given several opportunities for promotion but rejected them. *Id.* at 518. After noting that there was evidence which showed that the employee had in fact been denied promotions and that the employee had not been offered any promotions until after he had filed a grievance, we held that "[s]tanding is determined as of the date the suit is filed," *see id.* at 520, and that the "offer of promotion following complaint to the EEOC [did not] affect[] [the employee's] standing to raise the class issue," *see id.* at 519. As the *Senter* court explained, were it to hold otherwise, an employer could "negate an employee's standing to challenge discriminatory employment practices by the simple expedient of offering [the employee] unilaterally the relief he seeks for the class." *Id.* Here, the same reasoning applies. If, for example, we were to require an evaluation of standing throughout a Title VII case, in particular cases we would in effect be creating a loophole through which employers could avoid review of their hiring practices by either offering an employee the relief he seeks or by delaying the progress of the case such that the employee no longer maintained an interest in the job. Therefore, as the Supreme Court held in *Friends*

*of the Earth*, we conclude that the court must determine whether standing exists at the time of the filing of the complaint only.[11]

## 2. Associational Standing Through Tomblin

After reviewing the record to determine if the NAACP established standing as of the filing of its complaint, we conclude that the NAACP successfully obtained associational standing through Tomblin and therefore may pursue the claims it makes. Parma does not contest whether the interests at stake are germane to the NAACP's purpose or whether the claim or relief requested requires the participation of individual members; instead, it contests only whether the seven individuals listed in the NAACP's complaint have standing to sue in their own right. Of these seven individuals, Tomblin has standing to sue in his own right, as the NAACP has presented evidence demonstrating that Tomblin suffered a concrete and actual injury, that such injury was traceable to challenged actions by Parma, and that such injury is redressable by a favorable decision.

### a. Injury

First, the NAACP presented evidence demonstrating that Tomblin suffered a concrete and actual injury. The NAACP submitted evidence to show that, at the time it filed the complaint, Tomblin had been injured by employment practices that classified black applicants in a way that deprived them of an opportunity to compete for municipal

---

[11]We join the First, Fifth, Seventh, Eighth, and Ninth Circuits, which have all explicitly held that standing is determined as of the time the complaint is filed. *See Becker v. Federal Election Comm'n*, 230 F.3d 381, 386 n.3 (1st Cir. 2000); *White v. Lee*, 227 F.2d 1214, 1243 (9th Cir. 2000); *Park v. Forest Serv. of the United States*, 205 F.3d 1034, 1037 (8th Cir. 2000); *Perry v. Village of Arlington Heights*, 186 F.3d 826, 831 (7th Cir. 1999); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991). These cases are cited more thoroughly above. *See supra* pp. 17-18.

workers in Parma's municipal workforce has still remained practically non-existent. For example, between 1988 and 1996, Parma had hired only three black full-time employees out of more than 460 full-time municipal employees, resulting in Blacks comprising only .26% of the city's entire municipal workforce in 1996. As Hammerman noted in his affidavit, this percentage of black employees in Parma's public sector was exceedingly low, equaling less than one-ninth of the percentage in its private sector, one-fifteenth of that in the private sector of the Cleveland metropolitan area, and one-thirty-second of that in the public sector of the Cleveland metropolitan area. *See* J.A. at 957 (1997 Expert Report of Herbert Hammerman). In sum, contrary to the district court's conclusion, we conclude that Parma failed to show that its interim actions completely eradicated the effects of its allegedly discriminatory conduct in applying a "residency" requirement and in failing to advertise in a manner effective for reaching Blacks in the greater Cleveland community.

## C. RIPENESS

Parma argues that the NAACP's claims are not ripe for adjudication. "Ripeness requires that the 'injury in fact be certainly impending.'" *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997) (citation omitted). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Magaw*, 132 F.3d at 284. Thus, ripeness is "a question of timing." *Id.* A ripeness inquiry requires an analysis of two factors: (1) whether the issues at stake are fit for judicial decision; and (2) the extent of the hardship to the parties of withholding court consideration. *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995), *cert. denied*, 516 U.S. 1140 (1996).

In this case, Parma challenges only the first factor of the ripeness inquiry, arguing that the NAACP's claims are not ripe because "[n]o NAACP members allege that any of Parma's past or present residency requirements were ever

police officer examination in May 1996. Such evidence included (1) two Cleveland *Plain Dealer* and three *Sun Post* advertisements in Lakewood, and Brunswick, Ohio (two suburbs for which Parma provided no statistics concerning their racial composition) for an examination on June 1, 1991, *see* J.A. at 1069-72; Supp. J.A. at 153-55 (2) individual letters ordering advertisements in the Cleveland *Plain Dealer*, *Sun Newspapers*, *The Call & Post*, and Cuyahoga Community College for an examination on March 16, 1996, *see* J.A. at 340-47, 1302-05; and (3) individual letters ordering advertisements in the Cleveland *Plain Dealer*, *Sun Newspapers*, and *The Call & Post*, for an examination on May 4, 1996, *see* J.A. at 340-47, 1307-09. Parma also presented deposition testimony from Elizabeth Woolson, Secretary of the Civil Service Commission, who testified to Parma's placing two clerk typist advertisements in February 1996, two police officer advertisements in April 1996, one firefighter advertisement in February 1996, in the *Plain Dealer*, *see* J.A. at 340-43, 358, 365, 367; one firefighter advertisement and one clerk typist advertisement in February 1996 and two police officer advertisements in *The Call & Post* in April 1996, *see* J.A. at 322-24, 359, 368; one clerk typist advertisement in February 1996 and two police officer and firefighter advertisements in the *Sun* newspapers in April 1996,[21] *see* J.A. at 322-24, 342, 360, 364.

The alleged deficiency in Parma's recruitment efforts has arguably resulted in virtually no change in the racial composition of Parma's municipal workforce, even further indicating Parma's failure to eradicate the effects of the allegedly discriminatory actions in this case. As the evidence shows, despite the elimination of Parma's official residency requirement and its allegedly increased recruitment efforts through local newspapers and schools, the percentage of black

---

[21]Blanton and Childress, however, did testify that they may have seen advertisements for a civil service examination in Parma in 1989 and 1990. J.A. at 574, 717. McIntosh stated that he had received notification of a civil service examination in the mail in 1993. J.A. at 609.

jobs in Parma.[12] Specifically, the NAACP provided evidence showing that Tomblin was injured by Parma's move-in residency requirement, by Parma's use of word-of-mouth hiring practices and City Hall postings, by Parma's alleged failure to advertise municipal job openings in a manner that may help to recruit Blacks to its workforce, and by Parma's alleged failure to abide by its practice of routinely mailing notifications of civil service examinations and openings to interested applicants.

In particular, the NAACP presented evidence showing that, in 1990, Tomblin chose not to sit for a 1990 civil service examination in Parma because of the city's move-in residency requirement. J.A. at 649. During his 1997 deposition, Tomblin testified to the following:

Q: But you didn't actually sit for any civil service examination at that time, is that correct?

A: No. Certainly not.

Q: And that's because you decided not to for what reason?

A: *The fact the residency requirement was really a problem, knowing that the City of Parma has a reputation of discrimination in housing and it's well known in the black community and throughout the minority community that it is not a place where we are welcomed. I didn't see the point in that.*

---

[12]On December 20, 1991, Tomblin was included in the NAACP's first amendment to its complaint, which was entered pursuant to the district court's December 12, 1991 order requiring the NAACP to submit "'further particularized allegations of fact.'" J.A. at 11, 206-07.

J.A. at 649 (1997 Tomblin Dep.) (emphasis added).[13]

The NAACP also provided evidence demonstrating that, in February of 1990, Tomblin submitted an application for employment with Parma and requested that he be notified of the next available civil service examination so that he could pursue employment with the Parma police department, but that Parma failed to follow its alleged practice of sending routine notifications through the mail and thus failed to inform Tomblin of the city's next civil service examination. The next civil service examination, which was offered on June 1, 1991, and June 23, 1991, served as the basis for creating a July 11, 1991 eligibility list from which two new police officers were hired in 1993.[14] J.A. at 240, 921; *see also* J.A. at 224. As evidence of Tomblin's injury, the NAACP presented Tomblin's EEOC affidavit, in which Tomblin stated:

> I applied for a position of Safety Forces or Administrative Clerk in February, 1990. At that time, I was informed that my application would be kept and I would be notified of any Civil Services test given.

> I am aware that a test is given at least yearly for police and fire fighter[s]. I have never been notified of any test.

---

[13] We assume that Tomblin is referring to the physical portion of Parma's civil service examination, which was given on February 11, 1990. Parma offered the written portion of its civil service examination on November 29, 1989 and the physical portion on February 11, 1990. J.A. at 30.

[14] We do not believe that Tomblin's assertion that he did not sit for a civil service examination in 1990 due to Parma's move-in residency requirement is inconsistent with his claim that he was injured by Parma's failure to notify him of its June 1991 civil service examination. At a minimum, Tomblin was entitled to have the opportunity to decide if he wished to take the examination.

---

a change from part-time to full-time.[20] J.A. at 1165, 1189-1217. While Parma produced evidence of its attempts to recruit Blacks through local schools and local newspapers, including those with predominantly black readerships, such evidence was sparse. *See infra* Part II(B)(2). In sum, Parma failed to show that the recruitment, selection, and hiring practices challenged in this lawsuit are not likely to recur in the future.

### 2. Interim Relief Or Events Eradicating Effects

Second, Parma failed to prove that interim relief or events had irrevocably eradicated the effects of the allegedly discriminatory conduct. Although Parma claimed that it eradicated the effects of its allegedly discriminatory conduct through expanding its methods of advertising to recruit minorities through developing and distributing brochures at local colleges and malls and listing scheduled civil service examinations in various Cleveland newspapers, its proof of these new advertising schemes was scarce. *See, e.g.,* J.A. at 337. Parma presented evidence of newspaper advertisements covering *only four* civil service examinations over the course of a ten-year period: (1) a police officer examination in June 1991; (2) a clerk typist examination in February or March 1996; (3) a firefighter examination in March 1996; and (4) a

---

[20] Likewise, during his deposition in December 1990, Jack Krise, the cash manager for Parma, testified that just about every person he hired in Parma's tax division was a part-time employee or had been recommended by a current employee of Parma:

> A:   In just about every case, it's been somebody who knows somebody to recommend. Usually I will indicate to the office through — nothing formal. I don't say hey, I need to hire somebody, but somebody will hear, if you need anybody, and you know our filing is backing up, and we can sure use a person, I have somebody I can recommend, and that's generally how it's been.

J.A. at 1231 (1990 Krise Dep.).

Moreover, the evidence in the record suggests that Parma may have a "de facto" residency requirement, revealing that, despite the official elimination of its residency requirement in 1988, Parma stills asks a municipal job applicant a variety of questions regarding his connection to the city, including the number of years and months that the applicant has resided in Parma; whether the applicant has any relatives employed by the Parma; who recommended the applicant for employment with Parma; and where the recommender(s) lived. J.A. at 1183. Additionally, the evidence shows that, despite the repeal of the residency requirement in Parma, the overwhelming majority of new hires for Parma are Parma residents. For example, in 1997, twenty-five out of the twenty-eight applicants who secured employment with Parma were already residents of Parma, and eight of those twenty-eight applicants had close relatives who were Parma employees. J.A. at 1380-1473.

In addition to failing to prove that it was not still enforcing a residency requirement for municipal jobs, Parma also failed to show that it had stopped its alleged discriminatory practices with regard to advertising jobs to recruit black workers and with regard to the actual recruitment of black workers to its municipal workforce. For example, Parma failed to rebut completely the NAACP's evidence that Parma hires many of its municipal employees from City Hall postings and through word-of-mouth from its municipal employees, two methods which are claimed to have a disproportionate impact on Blacks. As the evidence in the record reveals, in 1995 and 1996, Parma hired a substantial number of its full-time municipal employees from its pool of provisional, part-time, or temporary employees, many of whom were recommended by current employees of Parma. J.A. at 1188-1216, 1230-31. Out of thirteen full-time positions posted for new hires between November 20, 1995, and March 8, 1996, at least six were filled by former part-time employees, and two others were filled by transfer or promotion without any indication of

J.A. at 240; *see also* J.A. at 212 (First Amendment To The Complaint). Additionally, the NAACP presented a January 20, 1993 letter, in which Gerianne Vanek, Parma's personnel director, noted that Tomblin had submitted an application and signed up for Parma's mailing list in February 1990. J.A. at 921.

In addition to providing evidence of Tomblin's injury due to Parma's failure to notify Tomblin of available civil service examinations, the NAACP presented evidence demonstrating that, at the time it filed the complaint, Tomblin suffered a similar injury due to Parma's use of word-of-mouth hiring practices and City Hall postings and by Parma's alleged failure to advertise its municipal positions in manner that could more easily reach Blacks in the greater Cleveland community. *Cf. Thomas v. Washington County Sch. Bd.*, 915 F.2d 922, 925 (4th Cir. 1990) (noting that "word-of-mouth hiring, . . . in the context of a predominantly white work force, serve[s] to freeze the effects of past discrimination"). According to the NAACP, because of Parma's allegedly deficient advertising,[15] Tomblin (and other Blacks) did not learn of the dates for Parma's civil service examinations or of any of Parma's municipal job openings.

More importantly, the NAACP demonstrated that Tomblin's injury was such that it warranted injunctive relief. The Supreme Court has consistently noted that, unless a past injury is accompanied by "continuing, present adverse effects," it "does not in itself show a present case or controversy regarding injunctive relief." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). The Supreme Court has further specified that "'some day' intentions — without any description of concrete plans,

---

[15]Parma presented evidence of job advertisements in several Cleveland newspapers, including those with black readerships, and of its efforts to recruit minorities in Cleveland's local colleges. Most of this evidence, however, concerns only practices which were undertaken in 1996 and thereafter. *See infra* Part II(B)(2).

or indeed even any specification of *when* the some day will be" are insufficient to support a finding of the kind of injury required to warrant injunctive relief. *Lujan*, 504 U.S. at 564; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995). In this case, at the time the NAACP filed its complaint, Tomblin had more than "some day intentions" of seeking and obtaining employment with Parma. In fact, as shown by Tomblin's correspondence with the city, he was still attempting to obtain employment with Parma as late as May 1993. As of May 4, 1993, Tomblin had written Parma the following letter to express his interest in obtaining employment with Parma as a police officer or firefighter:

> I'm disstressed[sic] over the fact that you stated that I would be notified of all upcoming Police and Fire exams. I was not notified of any exams, past or present. I don't believe that you realize the importance in me[sic] receiving notification of upcoming Police and Fire exams.
>
> Not being notified of past exams limits my opportunity to become a Police Officer for the City of Parma due to the fact that such openings are highly sought after and there is historically very little employment turn-over within Parma's safety forces. I would appreciate a response to why I was not properly notified, presumedly, like other prospective Civil Service applicants.

J.A. at 677. In sum, we conclude that, at the time the NAACP filed its complaint, Tomblin had satisfied the first requirement necessary for Article III standing: proof of injury.

### b. Causation

Second, the NAACP provided evidence showing that Tomblin's injuries were fairly traceable to the challenged actions of Parma. To begin, the NAACP submitted Tomblin's deposition testimony in which Tomblin asserted that he decided not to sit for a civil service examination in

### 1. Likely To Recur

First, Parma failed to prove that its alleged discriminatory recruitment, selection, and hiring practices, including the use of a residency requirement, could not reasonably be expected to recur. Indeed, Parma failed to show that its alleged discriminatory practices had ceased at all. *See Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) ("There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so."). As an initial matter, Parma failed to rebut the NAACP's proof of a genuine issue of material fact regarding whether Parma was still enforcing a residency requirement even after it had officially repealed such requirement in 1988. Less than two years after repealing its residency requirement, Parma had hired a total of six individuals, Greg Kohler, Vincent Semanik, Robert Tarro, Joseph Bobak, Daniel Heinz, and Orville Hildebrand, from an eligibility list that was created before Parma repealed its residency requirement. *See* Supp. J.A. at 58; J.A. at 974, 977-78, 982, 984. Additionally, as the evidence presented by the NAACP revealed, almost five years after Parma had "officially" repealed its residency requirement, Parma's personnel director informed a black applicant, specifically Tomblin, that "[t]he residency requirement still applies in the City of Parma." J.A. at 921. On January 20, 1993, the personnel director wrote in response to an inquiry from Tomblin:

> The Personnel Department is in receipt of your inquiry regarding employment with the City of Parma.
>
> Your resume and cover letter remain active in our file but we are providing you another application due to the fact your application dates back to February of 1990.
>
> *The residency requirement still applies in the City of Parma.*

J.A. at 921 (emphasis added).

## B.  MOOTNESS

The NAACP also argues that the district court erred in granting summary judgment on mootness grounds.  We review de novo a district court's decision regarding mootness.  *Craft v. United States*, 233 F.3d 358, 373 (6th Cir. 2000).

A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue.  *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992).  A case becomes moot "'when the issues presented are no longer 'live' or parties lack a legally cognizable interest in the outcome.'"  *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  In other words, a case becomes moot only when subsequent events make it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.*  The heavy burden of demonstrating mootness rests on the party claiming mootness. *Id.*

In this case, we conclude that the district court erred in determining that the NAACP's claims regarding Parma's alleged discriminatory recruitment, selection, and hiring practices had become moot.  We believe that Parma failed to meet its burden of proving mootness.

---

complaint was filed, the NAACP could not obtain associational standing through Allen because he never submitted an application to Parma, never inquired about jobs in Parma, or even asserted that he would have applied had he seen or heard any advertisements and therefore suffered no actual injury.  J.A. at 836-46.  Finally, although Crayton was a member of the NAACP at the time the complaint was filed, the NAACP could not obtain associational standing through her because Crayton could not show that Parma's decision not to hire her was fairly traceable to her race.  J.A. at 584-85.

As noted earlier, Parma does not dispute that the interests at stake are germane to the NAACP's purpose or that the NAACP's claims do not require the participation of individual members.

---

1990 because of Parma's move-in residency requirement. J.A. at 649.

Then, through Tomblin's testimony and correspondence between Tomblin and Parma, the NAACP showed that Tomblin's injury from failing to hear about available civil service examinations or job opportunities in Parma was fairly traceable to Parma's alleged failure to follow its practice of routinely mailing notifications of jobs and examinations.  Likewise, the NAACP presented evidence that showed that Tomblin's injuries were fairly traceable to Parma's use of word-of-mouth hiring practices and City Hall postings as well as to Parma's failure during the relevant time frame to advertise in a manner that was more likely to reach Blacks in the greater Cleveland community, as such practices arguably prevented Tomblin, a black non-resident of Parma, from learning about available municipal positions and civil service examinations.  As many courts have recognized, in the context of a virtually all-white workforce and a virtually all-white city (as Parma certainly was between 1990 and 1994 when Tomblin was actively seeking a job with the city), word-of-mouth hiring and similar types of recruiting practices, such as posting job openings in the municipal buildings of a non-diverse city, have a "tendency to perpetuate the all-white composition of a work force." *Thomas*, 915 F.2d at 925 (citation omitted); *see also Barnett v. W.T. Grant Co.*, 518 F.2d 543, 549 (4th Cir. 1975).  While Parma has submitted evidence of its efforts to recruit minorities to its workforce through advertisements in newspapers, its evidence primarily concerns advertisements run in 1996, *see* J.A. at 340-47, 358-60, 1069-78, 1302-09, and only four advertisements (all for the same examination) made between 1990 and 1994,[16] when Tomblin was actively seeking a job with Parma.  In sum, we conclude that, at the time the

---

[16]The only other pre-1996 evidence concerns four advertisements run in May of 1991 for civil service examinations held in June 1991, the first examination for which Tomblin claims he was not notified.  Supp. J.A. at 153-55; J.A. at 1069-78.

NAACP filed its complaint, Tomblin had satisfied the second requirement necessary for Article III standing: that his injuries were fairly traceable to the challenged actions.

### c. Redressability

Third, the NAACP presented evidence demonstrating that Tomblin's injuries are redressable by a favorable decision, as Tomblin would benefit from an injunction prohibiting Parma from using its allegedly discriminatory recruitment, selection, and hiring practices. Indeed, Tomblin expressly stated that he was "currently interested in working for the Parma Fire Department" and that he would seriously consider a job in Parma if the "police department, city council, and city government" abolished their past discriminatory ways and attitudes. J.A. at 660-61.

The fact that Tomblin does not express a present concrete interest in obtaining employment in Parma does not divest him, and consequently the NAACP, of standing. As the Supreme Court has previously recognized, Title VII litigation often involves lengthy delays, and "[t]he extended time it frequently takes to obtain satisfaction in the courts may force a discrimination claimant to suffer through years of underemployment or unemployment" before any resolution occurs. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 221 (1982). To allow employers to negate a plaintiff's standing by strategically delaying resolution of an employment discrimination case until the plaintiff is no longer interested in obtaining the position would place any plaintiff, including those seeking only injunctive relief, in an impossible dilemma. In most cases, a plaintiff "cannot afford to stand aside while the wheels of justice grind slowly toward the ultimate resolution of the lawsuit. . . . A job is needed — now." *Id.* Therefore, requiring a plaintiff to maintain a concrete interest in the sought-after employment throughout all stages of the litigation would effectively force that plaintiff to choose between finding new employment to feed and shelter himself and his family and foregoing other

employment to maintain his standing to sue. Additionally, such a requirement would unjustly compel a plaintiff, who was seeking injunctive relief and who was fortunate enough to find satisfactory employment elsewhere, to assert a present, concrete interest in a position that he had applied for in the distant past, even though a delayed move to that position could require the plaintiff to lose valued seniority, benefits, and status he had accrued at his current job during the pendency of often lengthy litigation.[17] *Cf. Senter*, 532 F.2d at 519 ("It would be anomalous to hold that an employee, in the process of exhausting administrative remedies, should lose standing to contest the very practices of which he complained in his charge to the EEOC merely because his employer, in the interim, offers him a promotion which he rejects."). In sum, the NAACP has presented evidence to show that Tomblin satisfies the redressability requirement[18] and thus has shown that it has standing to bring this lawsuit.[19]

---

[17]In cases where the plaintiff is also seeking monetary relief, such as backpay, such a requirement would force a plaintiff to fail in his duty to mitigate damages by seeking substantially comparable work so that he could maintain standing, which would, in turn, strip the plaintiff of any claim to backpay. *See Suggs v. Servicemaster Educ. Food Mgmt.*, 72 F.3d 1228, 1233 (6th Cir. 1996) ("A plaintiff in an action under Title VII has a duty to mitigate damages; she may not remain unemployed and collect a windfall.").

[18]Moreover, as this court noted in *Gillis*, "once an organization has alleged actual injury to 'its members, *or any one of them* . . . it may then argue on behalf of the 'public interest.' . . . By joining an organization dedicated to a particular goal in the public interest, members indicate a willingness to make certain sacrifices productive of that goal.'" *Gillis*, 759 F.2d at 572 (quotations omitted).

[19]Because Tomblin was a member of the NAACP at the time the NAACP filed its complaint and the NAACP has presented evidence to demonstrate that Tomblin had standing to sue in his own right at the time it filed its complaint, we need not address whether Collins, Childress, Blanton, or McIntosh did not have standing to sue in their own right because they were not members of the NAACP at the time the complaint was filed. Although Allen was a member of the NAACP at the time the