John DOE and Mary Doe, Individually and as Next Friends of the Minor, Chris Doe, and all others similarly situated, Plaintiffs,

v.

Paul Dee HUMAN, Superintendent of Gravette Public School District; A.P. Vohs, Principal of Gravette School Board; and John Garrett, Rex Elder, Jerry Easley, Charles L. Casey, Billy V. Hall, and Bill Meade, Members of the Gravette School Board; and Their Agents, Employees, and Successors in Office; and The Gravette Public School District, Defendants.

Civ. No. 89–5088.

United States District Court, W.D. Arkansas, Fayetteville Division.

Nov. 3, 1989.

**1504**

Jim Lingle, Rogers, Ark., for plaintiffs.

John Eidsmoe, Broken Arrow, Okl., for defendants.

## MEMORANDUM OPINION

MORRIS SHEPPARD ARNOLD,
District Judge.

For longer than anyone can reliably remember, perhaps for as long as 51 years, the Gravette, Arkansas public schools have provided an opportunity for its elementary school children to learn about the Bible. Bible classes are taught during regular school hours and in the school building, by volunteers who are not acting on behalf of any church and are not employees of the school. No course credit is given for these classes and attendance is voluntary. Parents who do not wish their children to attend can arrange for them to spend the time given over to Bible classes in the library, in tutoring sessions, or in other, unspecified, instructional situations. Ninety-six percent of the children attend the Bible classes.

The parents of one of the affected children filed this suit under 42 U.S.C. § 1983, asserting that the practice described above violates the Establishment and Free Exercise Clauses of the First Amendment of the Constitution of the United States, and in their complaint plaintiffs moved for a preliminary injunction. A hearing was held and a week later, this court filed an order granting the preliminary injunction. 725 F.Supp. 1499. A few days later, plaintiffs filed the instant motion for partial summary judgment as to their Establishment Clause claim. Plaintiffs assert that the case of *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), is directly on point, and that under the holding of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), defendants' practices are unconstitutional. Defendants, on the other hand, argue that *McCollum* is distinguishable from this case, that defendants' practices are constitutional under *Lemon,* that the "equal access" doctrine of *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), allows privately conducted Bible study programs, that other factual disputes preclude summary judgment, and that miscellaneous other issues preclude summary judgment. For the reasons stated below, plaintiffs' motion will be granted.

### I.

In *McCollum v. Board of Education, supra,* a school system created a program in which Protestant, Catholic, and Jewish instructors came into public schools and held classes during school hours. Although the program was purely voluntary, the Court held that the program unconstitutionally aided religion, because "[p]upils

compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend the religious classes." *Id.* 333 U.S. at 210, 68 S.Ct. at 464.

Defendants in *McCollum,* like defendants in this case, argued that "historically the First Amendment was intended to forbid only government preference of one religion over another, not an impartial governmental assistance of all religions." *Id.* at 211, 68 S.Ct. at 465. The Court explicitly rejected this argument, *id.* reiterating its earlier holding that governments may not "pass laws which aid one religion, aid all religions, or prefer one religion over another." *Id.* at 210, 68 S.Ct. at 465, *quoting Everson v. Board of Education,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947).

Defendants argue that *McCollum* is distinguishable from this case for numerous reasons. They assert first that in *McCollum* "the religious instruction was provided by specific religious bodies, whereas in Gravette the Bible instruction is nondenominational." In fact, the Gravette Bible study classes are clearly Christian, and therefore sectarian in nature. *See County of Allegheny v. American Civil Liberties Union,* —— U.S. ——, ——, 109 S.Ct. 3086, 3107, 106 L.Ed.2d 472 (1989) (although "[t]he history of this nation, it is perhaps sad to say, contains numerous examples of official acts that endorsed Christianity specifically ... this heritage of official discrimination against non-Christians has no place in the jurisprudence of the Establishment Clause").

■ Second, defendants argue that *McCollum* is distinguishable from this case because the religious instruction is provided by lay people rather than "official representatives of specific denominations...." The court fails to see the relevance of this fact. If defendants have established Christianity as a state religion, it is irrelevant whether they have done so through officials of a church or through Christian lay people unconnected with any denomination. A related argument is that in the Gravette program, unlike that invalidated in *McCollum,* no group sponsors the instruction.

The court is of the view that the absence of sponsorship is not a particularly important factor, and would not validate an otherwise unconstitutional program.

■ Defendants also note that "[i]n *McCollum* the religious leaders conducting the instruction took attendance and reported absences to the school officials; in Gravette they do not." This argument relates primarily to the voluntariness of the Bible instruction program, a factor the *McCollum* court explicitly refused to consider. *McCollum,* 333 U.S. at 207 n. 1, 68 S.Ct. at 463 n. 1 (Court finds it unnecessary to consider claim that due to peer pressure, program "voluntary in name only"). To the extent that this factor relates to the question of church/state entanglement, the court holds that it was not important to the decision in *McCollum.*

Defendants point out, additionally, that in *McCollum* the students who did not participate in religious studies had to leave the room, while in Gravette the participants leave the room. · This fact is relevant primarily to the voluntariness of defendants' program, a question which was irrelevant to the holding in *McCollum.*

Finally, defendants argue that a genuine issue of material fact exists as to whether the Bible study program is "primarily religious in character ..." (DB 4) and that the "question of the meaning of religion and faith ... needs a more complete hearing." (DB 13). By contrast, in *McCollum* defendants made no pretense that their classes were secular in nature. In its initial opinion, the court held that "it would be difficult, indeed impossible, not to categorize the instructional program undertaken here as a religious one." (MO 4). On the other hand, it is clear that a valid secular purpose exists for teaching the Bible. The court will discuss this question in greater detail below, in its discussion of *Lemon.*

In sum, the court finds that *McCollum* is on point. The court will therefore grant summary judgment unless it finds below that *McCollum* has been modified by *Lemon* or *Widmar,* [1] or that a genuine issue of

---

1. The court notes in passing that *McCollum* is still good law. In the Supreme Court's most

recent Establishment Clause opinion, it cited *McCollum* for the proposition that a state may

material fact exists as to whether defendants' program is primarily religious in nature.

## II.

■ Under *Lemon*, any government involvement with religion, to be constitutional, must have a secular purpose, its principal or primary effect must be one that neither advances nor inhibits religion, and it must not foster an excessive governmental entanglement with religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111. The Court has made it explicit that "[s]tate action violates the Establishment Clause if it fails to satisfy any of these" requirements. *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

### A.

■ Although Mrs. Smith, one of the Bible teachers at the Gravette school, is clearly a devout Christian, she also "believes the Bible is of great value in helping children to develop sound moral values and to understand and appreciate the culture in which we live, since that culture has been largely shaped by the Bible." (Smith Affid., para. 4). Under the circumstances, on the present state of the record, the court finds that there is a genuine issue of material fact as to whether the primary purpose of Gravette's program is religious or secular.

### B.

Even if defendants' program has a primarily secular purpose, it is still unconstitutional if the principal effect of the courses is either to advance or inhibit religion. The Gravette Bible classes are plainly not wholly secular in character. Nevertheless, defendants argue that even if the Bible study program has religious elements, its primary effects are the secular ones of "building character, forming moral values, and developing a truly educated person." (DB 19).

Even on the relatively undeveloped state of the record before the court, it is quite clear that the course in question is predominantly religious and devotional in nature. Many of the songs taught in the course are religious, although some contain moral messages as well. For instance, the song "Countdown" discusses Jesus's Second Coming to Earth (plaintiffs' Exhibit 13), the song "My B-I-B-L-E" (plaintiffs' Exhibit 16), is self-explanatory, and "This Old Saint" unapologetically states Christian dogma (plaintiffs' Exh. 2). The song "L.O. V.E." speaks of Jesus's love for mankind, exemplified by his crucifixion (plaintiffs' Exh. 14). Even if nothing else was taught, these songs alone would render defendants' program constitutionally infirm. But there is more. In classroom discussion, Barbara Stapleton, one of the teachers, emphasized that "Jesus is our gateway to Heaven. He laid down his life for us so that we could get to Heaven. He is our shepherd and he wants us all to be one big flock of sheep." (Plaintiffs' Exh. 16). These teachings would seem to have no secular effect whatsoever. The other major "non-song" exhibit, "The Bible In Felt" is quite clearly religious in nature, as it depicts Biblical events without elaboration. (Plaintiffs' Exhibit 1). In sum, the evidence in the record shows quite clearly that many of the songs and parables taught in the class endorse Christianity, and have very little, if any, secular effect.

It may be that other lessons have more secular content than those discussed above. For instance, the song "Work on Your Attitudes" (Plaintiffs' Exh. 15) is predominantly secular, and Gayla Hendren testified at the injunction hearing that she derived moral and historical benefits from the classes (DRB 10). Even if a substantial portion of defendants' program was predominantly secular, the court would find that the program as a whole was unconstitutional, for the reasons stated in *Abington School District v. Schempp*, 374 U.S.

---

not "allow public-school students to receive religious instruction on public-school premises." *County of Allegheny*, —— U.S. at —— n. 40, 109 S.Ct. at 3099 n. 40 (dictum). It follows from

this that any program unconstitutional under *McCollum* probably violates *Lemon* as well and that defendants' program is unconstitutional if it constitutes "religious instruction."

203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963):

> "Further, it is no defense to urge that the religious practices here may be relatively minor encroachments upon the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent; and in the words of Madison, 'It is proper to take alarm at the first experiment of our liberties.' ..."

Defendants further argue that even if the Bible course as presently constituted is unconstitutional, certain modifications could cure its legal infirmities. This court has repeatedly said that it has no inclination whatever to issue advisory opinions or to take over the Gravette Public School District, and it therefore declines defendants' invitation to outline a constitutionally permissible form of Bible instruction. The court acknowledges that several courts have indeed formulated alternative policies in cases like this, but declines to adopt their approach. If defendants implement alternative policies, the court may judge their constitutionality at that time if requested to do so by the plaintiffs.

### C.

■ Because defendants' program unconstitutionally advances religion, the court need not discuss the question of excessive entanglement in great detail. In the court's view, if an evidently religious study course is taught on school grounds during regular school hours, the school is excessively entangled in it regardless of who teaches such classes. If the classes were taught after school, and if the school board allowed other activities to take place on the premises after school, then it might well violate the free exercise clause not to allow religious instruction on the premises. See L. Tribe, *American Constitutional Law*, § 14–5 at 825 n. 12. More than this need not be said on this subject at this time.

### III.

■ Defendants also argue that the concept of "equal access" enunciated in *Widmar v. Vincent* applies to this case. Under *Widmar*, a school may not create "a forum generally open to student groups ... [but] enforce a content-based exclusion of religious speech." *Widmar*, 454 U.S. at 277, 102 S.Ct. at 278. *See also Mergens v. Board of Education of Westside Community Schools*, 867 F.2d 1076 (8th Cir.), *cert. granted*, —— U.S. ——, 109 S.Ct. 3240, 106 L.Ed.2d 587 (1989) (under Equal Access Act codifying *Widmar* and extending doctrine to secondary schools, school which allows any "noncurriculum-related student club" must also allow religious clubs).

The court notes initially that the idea of a limited forum is much more at home in the context of colleges and universities, where students operate as semi-autonomous citizens infrequently trammelled by persons acting *in loco parentis*. University classes, moreover, do not meet continuously nor is attendance for a certain number of hours a day required by law as is the case with Arkansas elementary schools. *See* A.C.A. § 6–16–102. In such an environment, it is easier to characterize the activity of a school with respect to religious exercises as mere permission and not active participation. In elementary schools, however, teachers and administration are charged with the duty to supervise their students constantly and to tend to their moral development. In the case of elementary schools, therefore, the notion of a limited forum is not one easily resorted to in order to save an activity from a claim of excessive entanglement. It may just be that it is not impossible for an elementary school to establish a forum from which it would be unconstitutional to exclude religious activities. But in this case, where no equal access policy existed before this lawsuit was filed, and where there is no history whatever of other extracurricular activities being allowed a place in the school day, permitting the present practice to continue would involve the school board in an excessive entanglement with religion. The court recognizes the question as a close one, but, on balance, this seems the correct result, especially when the *McCollum* case provides a kind of bright-line test for cases of this sort.

### IV.

Finally, defendants argue that genuine issues of material fact exist as to the fol-

lowing issues: (1) whether the Bible has a secular educational value; (2) whether the Bible instruction program has a secular purpose, and if so, whether it has an "overriding religious purpose which nullifies the secular purpose" (DB 5); (3) the extent of the school district's "entanglement" with the Bible classes (DB 5); (4) whether the program impermissibly advances religion; (5) whether the program "creates the impression ... that the state is endorsing or sponsoring religion." (DB 5); (6) whether the program as presently structured "creates undue peer pressure to participate...." (DB 5); (7) whether the program is in fact "primarily religious in character...." (DB 4); and (8) whether, if the program is unconstitutional as presently structured, it could be made constitutional by modifications.

All but the first and sixth of these contentions have been addressed above, and both of these contentions are irrelevant to the outcome of this case. Questions of peer pressure and voluntariness are primarily relevant to plaintiffs' Free Exercise claim rather than their Establishment Clause claim, and the educational value of the Bible is not in dispute. Accordingly, the court finds that no genuine issue exists as to any material fact.

## V.

In an addendum to their brief filed on September 12, 1989, defendants raise certain arguments not raised in their original brief.

■ First, defendants argue that the total exclusion of the Bible from public schools would violate freedom of speech and religion, as well as the right of Gravette parents to educate their children. Indeed, it is well settled that Bible study, "when presented objectively as part of a secular program of education, may ... be effected consistently with the First Amendment." *School District of Abington Twp., Pennsylvania v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963). Entry of summary judgment in this case, however, would not require total

exclusion of the Bible, but would merely enjoin a specific program. Thus, defendants' argument is beside the point.[2]

■ Defendants also argue that entry of an injunction in this case would violate Elsie Smith's right to freedom of speech. Mrs. Smith certainly has the right to discuss religion, but she has no right to teach a religious course during school hours on public school grounds.

Finally, defendants claim without elaboration that *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) is on point. In *Zorach*, the Court upheld a program where students were released from public schools so they could receive religious instruction at other locations. As the religious instruction in *Zorach* took place off campus, that case is not on point. Defendants argue that off-campus instruction is impossible in a rural district, and that an on-campus program is therefore permissible under *Zorach*. The court fails to see, however, how *Zorach* can be both applicable and inapplicable at the same time. Furthermore, defendants' broad interpretation of *Zorach* would require this court to ignore *McCollum*, because the major difference between the two cases is that the *McCollum* instruction was on-campus and the *Zorach* instruction was off-campus.

Accordingly, the court will grant partial summary judgment and make its preliminary injunction permanent.

---

2. Similarly, defendants argue that their classes "balance" secular humanism in public school textbooks (DRB 12). Even if defendants have

established one religion (secular humanism), such conduct does not allow them to establish a second (Christianity).