John DOE, Individually; Mary Roe, Individually, and Freedom from Religion Foundation, Inc., Plaintiffs,

v.

Sue PORTER, Individually, and as Superintendent of the Rhea County School System; and Rhea County Board of Education, Defendants.

No. 1:01–CV–115.

United States District Court,
E.D. Tennessee,
at Chattanooga.

Feb. 8, 2002.

R Stephen Doughty, Weed, Hubbard, Berry & Doughty, Joseph H Johnston, Nashville, TN, for plaintiffs.

Charles W Cagle, Lewis, King, Krieg, Waldrop & Catron, P.C., Michael E Evans, Davies & Humphreys, Nashville, TN, for defendants.

## MEMORANDUM

EDGAR, Chief Judge.

Rhea County, Tennessee, is no stranger to religious controversy in its public schools. In 1925, the Rhea County Courthouse was the site of the well known "Scopes" or "Monkey" trial, wherein high school teacher John Scopes was tried for violating a Tennessee statute making it a misdemeanor to teach "evolution theory" in the State's public schools. The trial pitted William Jennings Bryan, the "Great Commoner," representing the State, against Clarence Darrow for the defense. The legacy of that trial in some respects gives rise to this lawsuit.

Plaintiffs here claim that the Rhea County Board of Education and its superintendent are violating the Establishment Clause of the First Amendment to the United States Constitution by teaching the Bible as religious truth in the public schools. The Bible teaching is conducted by students at Bryan College. Bryan College is named in honor of William Jennings Bryan who, during the Scopes trial, expressed the wish that a school might be established in Dayton, Tennessee, the Rhea County seat, to teach the truth from a Biblical perspective.

Plaintiffs bring this action under 42 U.S.C. § 1983, and seek a declaratory judgment, injunctive relief, nominal damages and attorney fees. The case is now before the Court on the plaintiffs' motion for summary judgment [Court File No. 50]. The Court has heard oral argument on this motion.

### I. Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir.2001). The Court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir.2000). The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249, 106 S.Ct. 2505; *National Satellite Sports*, 253 F.3d at 907.

### II. Facts

The facts are not in dispute. Plaintiffs John Doe and Mary Roe are residents of Rhea County, Tennessee. They are parents of two minor children who currently attend public elementary school in Rhea County. John Doe and Mary Roe are members of the Freedom From Religion Foundation, Inc. ("FFRF"). FFRF is a non-profit organization, chartered under

the laws of the State of Wisconsin. It is organized for the purpose of promoting the constitutional principle of separation of church and state, and to educate the public on matters relating to non-theistic beliefs.

Defendants Rhea County School Board and Superintendent Sue Porter are responsible for the management and control over the Rhea County school system. For many years they have allowed a program entitled "Bible Education Ministry" ("BEM") to be conducted in the public schools. Currently the BEM program is carried out in grades kindergarten through five in three elementary schools. The Bible is taught during regular school hours to each grade for 30 minutes every week. The Rhea County School Board has never adopted any written description of the program. The schools do not obtain parental consent for students to participate. While the defendants claim the program is optional, they do not tell that to students. There is no evidence that any child has ever opted out of the program. Parents are provided no information about the content or structure of the program. The BEM program is not mentioned in the policy manual that the Rhea County school system has filed with the State of Tennessee.

The BEM program is operated by Bryan College. Travis Harvey Ricketts, Ph.D., Assistant Professor of History and Director of Practical Christian Involvement, oversees and supervises the program. The teachers are Bryan College students who volunteer to help students in the Rhea County schools to become "exposed to the Bible." For ordinary school instruction, the School Board requires that lesson plans be prepared by classroom teachers on a weekly basis and that those lesson plans be available for review by school principals. However, BEM lesson plans are not provided to the school sys-tem, nor are they reviewed by any school employee.

The School Board and Superintendent have essentially turned over the operation of the BEM program to Bryan College, making a place in the regular school curriculum and in the classrooms for the program. Bryan College students do prepare lesson plans for review by Dr. Ricketts. The students who teach need not be in any particular college program, nor have any particular major. All teaching for the BEM program is from the Bible.

### III. *Analysis*

#### A. *Standing*

The defendants' contend that the plaintiffs lack standing to bring this suit. After reviewing the record, the Court concludes that the plaintiffs do have standing.

Article III, Section 2 of the United States Constitution confines the jurisdiction of federal courts to the resolution of actual "Cases" or "Controversies." *See Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); *Arizonans For Official English v. Arizona*, 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). A core component of the Article III case-or-controversy requirement is standing. *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); *Raines*, 521 U.S. at 818, 117 S.Ct. 2312; *Arizonans For Official English*, 520 U.S. at 64, 117 S.Ct. 1055; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs bear the burden of showing that they have standing. *Raines*, 521 U.S. at 818–19, 117 S.Ct. 2312; *United States v. Hays*, 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d

908

635 (1995); *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

The Supreme Court holds that the "irreducible constitutional minimum" of standing consists of three essential elements. First, there must be an injury in fact—a harm or invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. A plaintiff must establish a "personal stake" in the dispute which means the injury must affect the plaintiff in a personal and individual way. The second element is causation. There must be a causal connection between the alleged injury and the defendants' conduct. The plaintiffs' injury has to be "fairly traceable" to the challenged action of the defendants and not the result of the independent action of some third party not before the Court. Third, it must be likely, as opposed to merely speculative, that the plaintiffs' alleged injury will be redressed by a favorable judicial decision. *Vermont Agency of Natural Res.,* 529 U.S. at 771, 120 S.Ct. 1858; *Raines,* 521 U.S. at 818–19, 117 S.Ct. 2312; *Hays,* 515 U.S. at 742–43, 115 S.Ct. 2431; *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130; *Cleveland Branch, N.A.A.C.P. v. City of Parma,* 263 F.3d 513, 523–24 (6th Cir.2001).

Plaintiffs have met their burden of showing standing. John Doe and Mary Roe have each submitted sworn affidavits which the Court takes into consideration when ruling on the summary judgment motion pursuant to FED. R. CIV. P. 56. In their affidavits, John Doe and Mary Roe state they are residents of Rhea County and they have two minor children who currently attend elementary school in the Rhea County public school system. This is sufficient to give John Doe, Mary Roe, and their children standing to bring the instant suit. *See McCollum v. Board of Ed.,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Parents generally have standing to assert claims on behalf of their minor children. *See, e.g., Smith v. Organization of Foster Families,* 431 U.S. 816, 841 n. 44, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Engel v. Vitale,* 370 U.S. 421, 423, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Altman v. Bedford Cent. Sch. Dist.,* 245 F.3d 49, 70 (2nd Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 68, 151 L.Ed.2d 34 (2001).

The plaintiff school students and their parents are not merely "concerned bystanders" seeking to air generalized grievances. They are directly affected by the BEM program. Children attending public schools and their parents have a constitutional right to receive a public education in compliance with the Establishment Clause contained in the First Amendment to the United States Constitution. It is well settled that public school students and their parents have standing to maintain a federal lawsuit challenging the constitutionality of a State law, regulation, or program adopted by public school authorities under the Establishment Clause without proving that particular religious freedoms are being infringed. *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Caldwell v. Craighead,* 432 F.2d 213, 220 (6th Cir.1970); *Wiley v. Franklin,* 468 F.Supp. 133, 145 (E.D.Tenn.1979); *see also Altman,* 245 F.3d at 72; *Doe v. School Bd. of Ouachita Parish,* 274 F.3d 289, 292 (5th Cir.2001); *Doe v. Beaumont Ind. Sch. Dist.,* 240 F.3d 462, 466–67 (5th Cir.2001) (*en banc* ).

John Doe, Mary Roe, and their children, who are currently attending public elementary school in Rhea County, have established that they meet all of the criteria necessary to have standing. They have shown that they are suffering an actual injury in fact regarding a violation or infringement of their rights protected under the Establishment Clause. The injury in

fact is concrete and particularized as to the plaintiffs. Plaintiffs have alleged conduct that directly affects them in a personal and individual way. There is a causal connection between the plaintiffs' injury in fact and the defendants' conduct; and the injury may be redressed by this Court.

■ Defendants contend that FFRF lacks standing on the ground it has not shown that the organization itself has suffered a distinct injury in fact. It is further argued FFRF lacks representational standing because it cannot show that any of its members are suffering an injury. This argument lacks merit. Although FFRF does not contend that the organization itself is suffering an injury caused by the defendants' conduct, FFRF does have standing to represent the interests of its members.

Even in the absence of a direct injury to its association or organization, FFRF has standing to bring suit as a representative of its members if it satisfies three criteria: (1) its members would otherwise have standing to sue in their own right; (2) the specific interests the association or organization seeks to protect are germane to its purpose; and (3) neither the legal claim asserted nor the relief sought requires the participation of the organization's individual members in the suit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 523–24; *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998); *Ohio Ass'n of Ind. Sch. v. Goff*, 92 F.3d 419, 422 (6th Cir.1996); *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710, 717 (6th Cir. 1995). FFRF satisfies each of these requirements. John Doe and Mary Roe are members of FFRF, and the Court has determined that John Doe and Mary Roe have individual standing to sue the defendants. Accordingly, FFRF has standing to be a party plaintiff in this action as a representative of its members in Rhea County.

## B. *The BEM Program*

The First Amendment to the United States Constitution declares, in part, that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." In this case we answer the question—whether the Establishment Clause proscribes the Rhea County School Board's Bible Education Ministry Program.

There has been considerable historical debate about the breadth of the Establishment Clause. Some have asserted that it was intended to do nothing more than prohibit the setting up of an official church and prevent Congress from interfering with relations between some of the States and the church. *See School Dist. of Abington Township v. Schempp*, 374 U.S. at 309–10, 83 S.Ct. 1560 (Stewart, J. dissenting). It is beyond the scope of this opinion to engage in historical debate. Suffice it to say that a majority of the Supreme Court has consistently found the Establishment Clause to be much broader than that, reaching to both State and Federal governments, and to many other governmental involvements with religion. Of course, this Court must follow existing legal precedent.

The Supreme Court has used various analytical approaches to draw the line between government and religion. One such approach is that set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105 (1971), wherein it was held that government action, to comply with the Establishment Clause, must (1) have a secular purpose; (2) have the primary effect of

neither advancing nor inhibiting religion; and (3) not foster an excessive governmental entanglement with religion. *Id.* at 612–613, 91 S.Ct. 2105. This is the so-called *"Lemon* test." The parties in this case have suggested the use of this test.

In recent years the Supreme Court has not made overt use of the *Lemon* test in articulating its rationale for deciding Establishment Clause cases. *See* Martha McCarthy, *Religion and Education: Wither the Establishment Clause,* 75 IND. L.J. 123 (2000); James L. Underwood, *The Proper Role of Religion in the Public Schools: Equal Access Instead of Official Indoctrination,* 46 VILL. L. REV. 47 (2001). However, the *Lemon* test has not been rejected by the Court and continues to be used by lower courts in evaluating Establishment Clause claims. *See American Civil Liberties Union v. Capitol Square Review & Advisory Bd.,* 243 F.3d 289, 305–308 (6th Cir.2001); *Coles v. Cleveland Bd. of Educ.,* 171 F.3d 369, 383–86 (6th Cir.1999); *Washegesic v. Bloomingdale Pub. Sch.,* 33 F.3d 679, 683 (6th Cir.1994); *Books v. City of Elkhart,* 235 F.3d 292, 301 (7th Cir.2000), *cert. denied,* 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (May 29, 2001). Moreover, it is clear that while the Supreme Court may not have recently engaged in *Lemon's* tripartite analysis, some elements of the *Lemon* test continue to be used by both the Supreme Court and lower courts.

In *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 592–93, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Supreme Court articulated an "endorsement" test to determine whether an Establishment Clause violation has occurred. Under this formulation a governmental practice may not have the "purpose or effect of 'endorsing' religion . . . ." *Id.* at 592, 109 S.Ct. 3086. Endorsement occurs when the government conveys or attempts to convey "a message that religion or a particular religious belief is favored or preferred." *Id.* at 593, 109 S.Ct. 3086, citing *Wallace v. Jaffree,* 472 U.S. 38, 70, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J. concurring). Thus, under either the *Lemon* test or the "endorsement" test we must examine both the purpose and effect of the governmental action.

■ In determining purpose the Court looks to whether the government subjectively intended to convey a message of endorsement or approval of religion. *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J. concurring). In a different context, which may be more relevant to this case, Justice O'Connor has observed that in Establishment Clause cases ". . . we continue to ask whether the government acted with the purpose of advancing or inhibiting religion." *Agostini v. Felton,* 521 U.S. 203, 223–24, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). In determining *the effect* of governmental action under the "endorsement" test, the Court makes an objective determination about whether a "reasonable observer" would conclude that the government has endorsed religion. *Capitol Square Review & Advisory Bd.,* 243 F.3d at 302; *Granzeier v. Middleton,* 173 F.3d 568, 573 (6th Cir.1999). This determination has been recognized by the Sixth Circuit as a clarification of the second prong of the *Lemon* test, *Granzeier,* 173 F.3d at 573, which asks whether the principal or primary effect of the government action advances or inhibits religion. *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105.

The Courts have looked with special scrutiny at government involvement with religious activity in public schools. The reason is that "students are young, impressionable, and compelled to attend public schools." *Coles,* 171 F.3d at 377. The Supreme Court has said that:

Families entrust public schools with the education of their children, but condition

their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.

*Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). Public schools play a key role in "the maintenance of a democratic pluralistic society," *Coles,* 171 F.3d at 377. Because the schools are "[d]esigned to serve as perhaps the most powerful agency for promoting cohesion among a heterogenous democratic people, the public school must be kept scrupulously free from entanglement in the strife of sects." *McCollum,* 333 U.S. at 216–17, 68 S.Ct. 461. As Justice Frankfurter has said, "The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools. . . ." *Id.* at 231, 68 S.Ct. 461 (Frankfurter, J.).

In a long series of cases, the Supreme Court has struck down many religious activities in the public schools. *Santa Fe Ind. Sch. Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (student-led, student-initiated prayer at football games); *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) ("nonsectarian" prayer at graduation ceremonies); *Edwards,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (state statute forbidding teaching of evolution in public schools unless accompanied by instruction in "creation science"); *Wallace,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (state statute mandating "a period of silence . . . for meditation or voluntary prayer"); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (state statute requiring posting of Ten Commandments in public schools); *Epperson v. Arkansas,*

393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (state statute forbidding teaching of evolution in public schools); *Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (state statute requiring daily readings from Bible); *Engel,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (New York Board of Regents prayer); *McCollum,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (religious teaching during regular school hours), Moreover, lower courts, including this one, have specifically found Bible classes like those in Rhea County as violative of the Establishment Clause. *Doe v. Human,* 725 F.Supp. 1499 (W.D.Ark.1989); *Crockett v. Sorenson,* 568 F.Supp. 1422 (W.D.Va. 1983); *Wiley,* 468 F.Supp. 133 (E.D.Tenn. 1979).

 It has never been held that there is a ban on all religious activity in public schools. *Santa Fe Ind. Sch. Dist.,* 530 U.S. at 313, 120 S.Ct. 2266. For example, a student may voluntarily pray at school. *Id.* Also, religious organizations may use public school facilities under some circumstances. *See Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). But the government, through its public school system, may not teach, or allow the teaching of a distinct religious viewpoint. This is what the Rhea County School Board has done by allowing the teaching of the Bible through the BEM program in the elementary schools of Rhea County. In so doing, these defendants have acted with both purpose and effect to endorse and advance religion in the public schools. This is prohibited by the Establishment Clause.

 As one of this judge's predecessors, Frank W. Wilson, has pointed out at length, the Bible may be taught in the public schools if it is taught by trained educators, and if it does not encourage a commitment to a set of religious beliefs. Such biblical instruction may include "nondevotional instruction in biblical literature,

biblical history, and biblical social customs." *Wiley v. Franklin,* 497 F.Supp. 390, 394 (E.D.Tenn.1980). The instruction in the Rhea County Schools does not meet these criteria. The Rhea County courses are being taught to the youngest and most impressionable school children by college students who have no discernable educational training and no supervision by the school system. The BEM lesson plans retained by Bryan College reveal that the children are being taught that the Bible conveys literal truth about God and Jesus Christ reflective of the Bryan College "Statement of Belief." [1] In these classes, students are asked to memorize Bible verses, act out skits of Biblical stories, and sing songs such as "Jesus Loves Me," "My God Is So Great," "Pharaoh, Pharaoh," "Twelve Men Want to Spy on Canaan," "Shout to the Lord," "Change My Heart, Oh God," and "I'm In The Lord's Army." In short, the public school elementary students are being taught what might well be a Sunday School class in many of the Christian churches in Rhea County. At oral argument, counsel for defendants conceded that the Bible was indeed being presented in the Rhea County Schools "as the truth." [2]

1. The Bryan College "statement of belief" which must be subscribed to by all trustees, officers, and members of the faculty, is as follows:

 We Believe:

 that the Holy Bible, composed of the Old and New Testaments, is of final and supreme authority in faith and life, and, being inspired by God, is inherent in the original writings;

 in God the Father, God the Son, and God the Holy Ghost, this Trinity being One God, eternally existing in three persons;

 in the virgin birth of Jesus Christ; that he was born of the virgin Mary and begotten of the Holy Spirit; that the origin of man was by fiat of God in the act of creation as related in the Book of Genesis; that he was created in the image of God; that he sinned and thereby incurred physical and spiritual death;

 that all human beings are born with a sinful nature, and are in need of a Savior for their reconciliation to God;

 that the Lord Jesus Christ is the only Savior, that He was crucified for our sins, according to the Scriptures as a voluntary representative and substitutionary sacrifice, and all who believe in Him and confess Him before men are justified on the grounds of His shed blood; and

 in the resurrection of the crucified body of Jesus, in his ascension into Heaven, and in "that blessed hope," the personal return to this earth of Jesus Christ, and He shall reign forever;

 in the bodily resurrection of all persons, judgment to come, the everlasting blessedness of the saved, and the everlasting punishment of the lost.

2. The BEM lesson plans make it clear that the Bryan College students are teaching the Bible as religious truth. The lesson plans are filled in by the teaching students on a form provided by Bryan College. One part of the form reads: "(LOOK) How I Plan To Help Students See The Truth: (Pupils need to be involved. Plan how the Bible lesson applies to them. Help them to determine for themselves how it applies to their lives. Give examples of how you plan to do this)." The following are some excerpts from recent lesson plans:

 *12/3/00* "... we will make sure they know what the true meaning of Christmas is. It was that God sent his son to earth to be born as a baby, a baby who would one day die on the cross for our sins so that we can be saved."

 *2/21/01* A lesson objective—"Believe the Jesus can perform miracles."

 *3/25/01* Describing a skit—"We will say, 'O King can we go through the land.' And their part will be to yell 'No.' We will also talk about Moses hitting the rock, and their part will be to say, 'Kathump.' They will let their next part be to hiss like a snake when we talk of the snakes coming."

 *3/25/01* "... We will ask them to give some examples of how they have tried to blame someone else for their own sin."

 *3/27/01* "We will tell an action-packed drama of the Israelites being biten [sic] by the snakes that God sent as punishment for their disobedience."

In addition to the content of the BEM program, the wholesale delegation of the administration of that program to Bryan College, a decidedly religious institution, by itself results in an impermissible entanglement of government and religion. *See Board of Educ. of Kiryas Joel Village Sch. Dist.*, 512 U.S. 687, 696–97, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994). That the BEM classes are supposedly voluntary does not make them constitutionally permissible. For one thing, it is doubtful that the classes are indeed truly voluntary given the very young age of the students involved and there being no evidence of anyone ever having been excused. Even if children can be excused, they may not be required to choose between their right to a public education and their religious beliefs. *See Lee*, 505 U.S. at 596, 112 S.Ct. 2649;

*Santa Fe Ind. Sch. Dist.*, 530 U.S. at 291–92, 120 S.Ct. 2266; *Schempp*, 374 U.S. at 224–25, 83 S.Ct. 1560; *Engel*, 370 U.S. at 430, 82 S.Ct. 1261; *McCollum*, 333 U.S. at 232–33, 68 S.Ct. 461.

The Rhea County School Board argues that the BEM program does not teach religion, but that its purpose and effect is to teach character. Defendants therefore say that the program has a secular purpose. Hopefully, character is indeed a byproduct of religious instruction. However, even if the defendants assert a secular purpose, and even if the classes do promote character, this does not legitimize proselytizing religious activity in the schools. *Edwards*, 482 U.S. at 592, 107 S.Ct. 2573; *Stone*, 449 U.S. at 41, 101 S.Ct. 192; *Schempp*, 374 U.S. at 223–24, 83 S.Ct. 1560; *Human*, 725 F.Supp. 1503, 1508

*4/4/01* "I hope to convey the truth of the gospel that everything Jesus did was b/c he loves us."

"Tell story or resurrection. Jesus really died, and then he was made alive again. All b/c he loves us & wants us to live w/him, have new life too."

*4/16/01* "We want the students to realize the importance of 'Last Words.' to learn and remember what Jesus' last words were.' "

"„„ we will explain the events following Jesus' last words. We will explain how Jesus ascended into heaven and of the angels coming and questioning the disciples."

*9/25/01* "Turn out the lights and tell the children [to] close their eyes. Explain about the darkness. This is all there was before God created the world. Then God made the sun, moon and stars. Turn on a flashlight to show them how light came into the world .... Stress that only God could make all this."

*10/23/01* "Teach kids about the creation of man & the fall of man .... Teach kids how Adam and Eve fell into temptation and how we as humans can also do this .... Show the kids a bag of dirt and ask them what can be made from it."

*10/29/01* "We want to teach them about how on the 5th day God made the birds and the fish."

*10/29/01* "The children will draw/make a 'hard heart' and we will discuss how the Pharoah's heart was disobedient and how we can have soft, obedient hearts to our teachers, parents and God.' "

*10/30/01* "We want to focus on how the kids can have a great relationship with God by just simply following his instructions. We just have to read God's word to understand him. The kids should see that the Bible is full of instructions for us and is a source of light."

"We will act out a skit that involves the kids. We will turn off the lights and pretend our batteries are dead in our flashlight. It will be scary for a little while, but then we find the light just like the Bible is our source of light and life isn't so scary anymore. We will also pass out some sort of candy as a reward for participating in the game."

"Show the kids how the flashlight story relates to the Bible story if we put new batteries in the flashlight would show us the way, just as finding the Bible brings light into our life."

*10/30/01* A lesson objective—"That the Bible is true and it is the instrument that can give guidance and direction in your life."

(W.D.Ark.1989). The Establishment Clause is not satisfied by the mere existence of some secular purpose when that purpose is dominated by a religious purpose. *Lynch,* 465 U.S. at 690–91, 104 S.Ct. 1355 (O'Connor, J. concurring). That is the case here.[3]

This is not a close case.[4] Since 1948, it has been very clear that the First Amendment does not permit the State to use its public school system to "aid any or all religious faiths or sects in the dissemination of their doctrines." *McCollum,* 333 U.S. at 211, 68 S.Ct. 461. The facts of the instant case do not differ in any substantial way from those in *McCollum,* except that, if anything, they make out an even stronger case for violation of the Establishment Clause. This does not mean that the public schools must be hostile to religion. The Constitution demands only that they be neutral. *Board of Educ. of Kiryas Joel Vill. Sch. Dist.,* 512 U.S. at 696, 114 S.Ct. 2481; *Schempp,* 374 U.S. at 215, 83 S.Ct. 1560; *Epperson,* 393 U.S. at 104, 89 S.Ct. 266. Requiring religious teaching to be done outside the schools satisfies the best interests of both government and religion. The interest of the government and its schools is set forth above. The interests of religion are aptly stated by Justice Kennedy in *Lee v. Weisman:*

> [I]n the hands of the government what might begin as a tolerant expression of religion views may end in a policy to indoctrinate and coerce. A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed.

505 U.S. at 591–92, 112 S.Ct. 2649. It is, therefore, understandable why many religious organizations have endorsed specific restrictions about how the Bible should be taught and used in the public schools.[5]

3. Tennessee law does require character education in public schools. TENN. CODE ANN. § 49-6-1007. Defendant Sue Porter, the Rhea County School Superintendent, testified in a deposition that she did not consider the BEM program as a part of the required character education. She also testified that the school system has another program which satisfies the State mandated character education program.

4. On October 15, 1999, defendant Porter was advised by School Board attorneys that the BEM program was unconstitutional.

5. *See* THE BIBLE LITERACY PROJECT, INC. AND FIRST AMENDMENT CENTER, THE BIBLE & PUBLIC SCHOOLS: A FIRST AMENDMENT GUIDE (1999); FIRST AMENDMENT CENTER, A TEACHER'S GUIDE TO RELIGION IN THE PUBLIC SCHOOLS 1999. The Bible Literacy Project, Inc. is located at 115 East 62nd Street, New York, N.Y. 10021. The First Amendment Center is located at 1207 18th Avenue South, Nashville, TN 37212.

The Bible Literacy Project publication is endorsed by the following organizations:
 American Association of School Administrators
 American Federation of Teachers
 American Jewish Committee
 Anti–Defamation League
 Association for Supervision and Curriculum Development
 Baptist Joint Committee on Public Affairs
 Christian Educators Association International
 Christian Legal Society
 Council on Islamic Education
 National Association of Evangelicals
 National Association of Secondary School Principals
 National Council of Churches of Christ in the U.S.A.
 National Council for the Social Studies
 National Education Association
 National School Boards Association
 Union of American Hebrew Congregations

The Teacher's Guide is endorsed by all of the above organizations plus the following:
 Catholic League for Religious and Civil Rights
 National Association of Elementary School Principals
 National PTA
 Union of Orthodox Jewish Congregations of America

Counsel for the defendants contended at oral argument that since "Rhea County is a place where they respect the Bible," it ought therefore to be at liberty to teach the tenets of the Bible in its public schools as truth. This argument reflects a misunderstanding of the Constitution of the United States. It is probably true that the citizens of Rhea County who are of the Christian faith are in the majority. This, however, does not give them license to teach their religion in the public schools. The Constitution in this area and others protects persons who happen to be in the minority. We all—the majority and the minority—live in the same Nation. The Constitution protects each one of us, including those who may not have the same religious views as the School Board.[6]

### IV. *Conclusion*

A judgment will enter **GRANTING** the plaintiffs' motion for summary judgment. The Court will **GRANT** the plaintiffs' a declaratory judgment that the policy and practice of promoting religious education in the Rhea County public schools is unconstitutional, and that defendants have deprived plaintiffs of their civil rights under color of law in violation of 42 U.S.C. § 1983. Plaintiffs will be **AWARDED** nominal damages of **One Dollar ($1.00)** along with reasonable attorney fees under 42 U.S.C. § 1988, and their costs of action pursuant to 28 U.S.C. § 1920.

---

**6.** Of course the plaintiffs, by exercising their constitutional rights, do not thereby imply any lack of respect for the Bible.